**UNITED STATES of America, Appellee,**

v.

**Robert AULICINO, Jr., David Cleary, and Louis Ruggiero, Jr., Defendants–Appellants.**

**Nos. 175, 176 and 641, Dockets 93–1883, 94–1027 and 94–1214.**

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 1994.

Decided Jan. 5, 1995.

Paul G. Gardephe, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., S.D.N.Y., Elizabeth Glazer, Asst. U.S. Atty., on the brief), for appellee.

Robert J. Krakow, New York City, for defendant-appellant Aulicino.

Steven M. Statsinger, New York City (The Legal Aid Soc., Federal Defender Div., on the brief), for defendant-appellant Cleary.

Gail E. Laser, New York City, for defendant-appellant Ruggiero.

Before: OAKES, KEARSE, and MINER, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Robert Aulicino, Jr., David Cleary, and Louis Ruggiero, Jr., appeal from judgments of conviction entered in the United States District Court for the Southern District of New York following a jury trial before then-*Judge* Kenneth Conboy, 824

F.Supp. 379. Aulicino was convicted on one count of conspiracy to kidnap, in violation of 18 U.S.C. § 1201(c) (1988), and was sentenced principally to 78 months' imprisonment, to be followed by a five-year term of supervised release. Cleary and Ruggiero were convicted of participating in, and conspiring to participate in, the affairs of a racketeering enterprise, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d) (1988). In addition, Cleary was convicted on 23 other counts including kidnaping and conspiracy to kidnap, in violation of 18 U.S.C. §§ 1201(a) and (c) (1988); extortion, in violation of 18 U.S.C. § 1951 (1988); travel and commission of violent crimes in aid of racketeering, in violation of 18 U.S.C. §§ 1952 and 1959 (1988); and using and carrying firearms in connection with crimes of violence, in violation of 18 U.S.C. § 924(c) (1988). Ruggiero was convicted on 32 similar counts. Cleary and Ruggiero were sentenced by Judges Conboy and Allen G. Schwartz, respectively, to life imprisonment, to be followed by five years of supervised release.

On appeal, one or more of the defendants contend principally that the evidence was insufficient to establish a RICO pattern; that the admission of coconspirator hearsay evidence was improper; and that the district court erred in using an anonymous jury. In addition, Aulicino contends that the evidence was insufficient to establish his guilt on the count on which he was convicted; and Ruggiero and Aulicino challenge their sentences. For the reasons below, we find no basis for reversal.

## I. BACKGROUND

The present prosecution centered on a kidnaping ring, most of whose targeted victims were highly successful narcotics dealers. The ring was divided into two "crews." One crew, led by Steven Palmer, identified potential victims; members of the other crew, whose leaders were Ruggiero and Cleary, then impersonated law enforcement officers, purported to arrest the victim, abducted him, and ordered him to raise a ransom.

The government's case was presented principally through the testimony of more than 40 witnesses; physical evidence, including law enforcement badges, firearms, and handcuffs, seized from Cleary's home or from Ruggiero, Cleary, Aulicino, and other coconspirators; and tape recordings of conversations between coconspirators and of ransom calls made by Ruggiero to one victim's family. Three of the witnesses, Derrick Augustine, Albert Van Dyke, and William Conklin, were members of the ring who had participated in the planning or execution of the kidnaping conduct. The evidence, taken in the light most favorable to the government, was as follows.

### A. The Kidnaping Conspiracy

Palmer conceived the kidnaping scheme in 1990. The group he led included Augustine, Van Dyke, and codefendants James Brown, Keith Green, and Robert Cherry, all of whom were or had been active in drug trafficking in Harlem and the Bronx. Augustine, who had worked for many of the most successful Harlem drug traffickers, was recruited as a member of this crew to select appropriate kidnaping victims. Palmer told his crew that he knew men who would pose as law enforcement officers to abduct the victims and extract the ransoms. For this aspect of the scheme, Palmer called upon Ruggiero and Cleary. The crew led by Ruggiero and Cleary included codefendants Anthony Castelli, Richard Olivieri, and Michael Palazzolo. Palmer, Augustine, and other members of their crew met with Ruggiero and Cleary to discuss potential victims and likely ransoms. They compiled a list of 10 targets. Over the next several months, seven attempts were made, with varying degrees of success.

Augustine testified that in late 1990 he informed Palmer that a drug dealer named Otmar Delaney was doing an active drug business at a garage in Harlem. Palmer relayed the information to Ruggiero. Ruggiero, with an associate apparently identified in the record only as "Tommy," followed Delaney to his home in Yonkers, New York; Ruggiero, stating that he was a police officer, approached Delaney and placed him under "arrest." Ruggiero and "Tommy" put Delaney into the trunk of their car and took him to a motel in New Jersey.

In the motel room, Ruggiero handcuffed Delaney to a chair and tortured him with a staple gun until he eventually agreed to pay $750,000. Ruggiero at first used Delaney's cellular telephone to arrange payment of the ransom by Delaney's half-brother. When the batteries in that telephone went dead, however, Ruggiero left the room to use a public telephone. In Ruggiero's absence, Delaney told "Tommy" he needed water, and when "Tommy" went to the bathroom to get it, Delaney, still handcuffed to the chair, escaped from the room. He explained his predicament to a truck driver in the parking lot, and the two went to the motel manager's office to summon the police. While they were there, Ruggiero entered the lobby, and Delaney retreated, saying that Ruggiero was one of his kidnapers. With one hand still handcuffed to the chair, Delaney commandeered his benefactor's truck and drove off wildly, with the truck driver clinging to the side. The truck collided with two other vehicles and came to a stop. The police arrived; Ruggiero and "Tommy" had fled.

Members of the ring met to discuss the Delaney fiasco. Palazzolo assured the Palmer crew that "nothing like that would ever happen again." (Trial Transcript ("Tr.") 348.) The coconspirators were angry that Delaney had gotten away, and they made new attempts to extort money from him. Ruggiero and Cleary resumed surveillance of Delaney's garage. Members of both crews made telephone calls to threaten new kidnaping attempts unless Delaney paid them. At one point, Ruggiero drove into the garage "[t]o scare them up some, to let them know that they got away but they going [sic] to get them again[,] and show his face." (Tr. 350.) These postkidnaping extortion attempts apparently ceased when Delaney, with a false promise of payment, lured members of the Palmer crew to a meeting that ended in a shootout.

The next kidnaping victim was Alvin Cassidy Goings, for whom Augustine had sold narcotics for several years. Shortly after Christmas 1990, Ruggiero, Cleary, Castelli, Olivieri, Palazzolo, and members of the Palmer crew met outside of a laundromat owned by Goings and followed him to other locations in the Bronx. Eventually, members of the Ruggiero/Cleary crew pulled Goings over to the side of the road, flashing law enforcement badges. Cleary and Palazzolo took Goings from his car, searched and handcuffed him, and placed him in the ring members' van. The ring extracted from Goings a sizeable ransom. Members of the Palmer crew were told by Palmer and the Ruggiero/Cleary crew that the payment was $400,000; Palmer's crew members believed, based on neighborhood rumors, that the payment might have been as high as $1 million. Cleary later confided to one witness (see Part II.A. below) that the ransom had been $1 million. Some of the ransom from this kidnaping was used to purchase and customize sedans to be used in further kidnapings.

On January 26, 1991, ring members kidnaped Roberto Mercedes, who previously had supplied narcotics to Augustine. Ruggiero, Olivieri, and Palazzolo conducted a close surveillance of Mercedes's sporting goods store, with Cleary and Augustine watching from a greater distance. After Mercedes left his store and went into a barber shop, Olivieri and Palazzolo entered the barber shop and purported to arrest Mercedes. They put Mercedes into their car, and, with Ruggiero, drove off. Ruggiero made numerous ransom calls to Mercedes's family. Despite Mercedes's being tortured, his brother refused to pay the demanded ransom. Some members of the ring began to suspect the ransom demands were futile because members of Mercedes's group preferred that he not be returned.

Because Olivieri and Palazzolo were concerned that Mercedes had seen their faces in the barber shop, Palmer ordered Brown to kill Mercedes; Brown gave Cherry a gun and turned the task over to him. Cherry transported Mercedes in the trunk of a car to a vacant lot in the Bronx, planning to shoot him there. When the trunk was opened, however, Mercedes came out kicking; although shot several times, he escaped and safely reached a police station. Notwithstanding the decision to kill Mercedes, Ruggiero continued to attempt to collect ransom money from Mercedes's brother; he was still trying some 10 minutes after Mercedes had

reached the police station. Ruggiero abandoned his efforts when the brother demanded to see Mercedes before making any payment.

The ring next attempted to kidnap a major Harlem narcotics dealer named Richard Simmons, for whom Augustine had worked. Palmer, Brown, Ruggiero, Cleary, Castelli, Olivieri, and Palazzolo trailed Simmons to a street corner in Harlem, where Ruggiero and Cleary attempted to "arrest" him. However, Simmons had learned of the attacks on Delaney and Goings and had heard a description of Ruggiero; when Ruggiero and Cleary approached, Simmons clung to his car and yelled for the police. The ring members fled.

In February 1991, the ring attempted to kidnap a drug dealer whom Augustine knew only as "Carlos." They enlisted the aid of Conklin, who testified that he was offered $5,000 by Olivieri if he would help to "grab" a man off the street. Conklin went, as instructed, to Olivieri's home where he convened with Olivieri, Palazzolo, and Aulicino. The four of them drove to Cleary's house in New Jersey; while Olivieri went into the house, Palazzolo instructed Conklin and Aulicino on how to "get this guy" who was their target. (Tr. 1161.) Olivieri and other crew members emerged from Cleary's house and the whole group proceeded to New York City. Conklin testified that Palazzolo repeated the instructions to Conklin and Aulicino that "all ... me and Bobby got to do is slide the door open, when we see him, ... grab him and pull him into the van." (Tr. 1167.) Later, however, when Palazzolo learned that Conklin and Aulicino were to be paid $5,000, he advised them to ask for more because the victim might be killed.

The kidnaping of Carlos never occurred. When the group drove from New Jersey to a street corner in a New York City "minority neighborhood" where Carlos was expected to be, there were some 30 people there. The ring members were unable to pick out Carlos and, in any event, did not want to attempt a kidnaping with so many people around.

Next, the ring attempted to kidnap Jorge Davila, a successful numbers banker for whom one member of Palmer's crew had worked. After at least two planning sessions, members of the two crews met on February 27, 1991, at a Wendy's restaurant near Davila's home in Queens. Six of the men proceeded in two cars to Davila's house. Ruggiero, Cleary, and Van Dyke parked across the street from the house; Palazzolo, Olivieri, and Aulicino parked down the block. As they waited for Davila to come home, however, the police arrived. The police first queried Cleary, who was in the driver's seat of the first car. When Cleary failed to produce either a driver's license or a car registration, and a policeman noticed ammunition on the floor of the car, Cleary, Ruggiero, and Van Dyke were arrested. Then, when Olivieri and his passengers stealthily approached in the second car, whose license plate was in sequence with the plate on the car driven by Cleary, an officer stopped that vehicle. When Olivieri likewise could not produce a registration, he was asked to step out of the car. A pat-down revealed that he was carrying a firearm. Palazzolo and Aulicino were asked to step out of the car, and a search of the car turned up a loaded and cocked automatic handgun and a bag containing, *inter alia*, another handgun, a set of handcuffs, and two police shields. Olivieri, Palazzolo, and Aulicino were then arrested.

On March 31, 1991, ring members kidnaped David Crumpler, a restaurant owner who dealt cocaine in the Bronx. While Ruggiero, Cleary, and Castelli waited outside of Crumpler's restaurant, Cherry and two other members of Palmer's crew entered brandishing guns and badges and brought Crumpler out in handcuffs. They took him to a nearby gas station; he was transferred to the trunk of the car occupied by Ruggiero, Cleary, and Castelli, and was then taken to New Jersey. Some hours later, Crumpler's wife received a ransom demand for $750,000. Despite torturing Crumpler with a blackjack, a stun gun, and a staple gun, Ruggiero, Cleary, and Castelli were unable to get Crumpler or his family to pay the ransom. Ruggiero eventually asked Palmer to come get Crumpler. Palmer, Augustine, Brown, and crew member Barry Shawn took Crumpler back to New York, and Shawn shot him to death.

Crumpler's handcuffed body was found in a vacant lot in the Bronx.

On April 17, 1991, Palmer was murdered. Augustine testified that he, Brown, and other Palmer crew members had decided to kill Palmer because they believed Palmer had pointed the finger at them in the Harlem community with respect to the series of kidnapings. Ruggiero, Cleary, Olivieri, and Palazzolo, however, feared that Palmer might have been killed by one of the kidnaping victims. A wiretap intercepted anxious conversations between Ruggiero and Cleary speculating that Delaney might have killed Palmer, and between Cleary and Palazzolo speculating that Simmons might have done it. In a May 22, 1991 telephone conversation with Ruggiero, Augustine attempted to encourage the belief that Palmer had been killed by one of the kidnaping victims. In addition, in that conversation, Augustine said, "I'm telling you, we need to get smart, man. One time and then leave this shit alone." Ruggiero responded "Yup," and "Maybe we will."

The surviving members of the ring attempted no further kidnapings. Cleary was concerned that his telephone had been wiretapped. (It had been: when he called the telephone company in May 1991 and asked how he could find out whether federal agents had tapped his telephone, that conversation was intercepted.) In another May 1991 intercepted conversation, Ruggiero and Cleary discussed their concern that Van Dyke, who apparently had remained in jail following the Davila-related arrests, might begin to cooperate with the authorities. In early June 1991, Cleary was arrested in New Jersey on unrelated state charges; he remained in jail for at least the next several months. In the summer of 1991, Augustine fled New York, in part, he said, because "the police was [sic] looking for me, because of, you know, the kidnapping and the murder that was going on in the Bronx." (Tr. 304.)

### B. The Present Prosecution

Eventually, most of the surviving ring members were arrested; a 50–count indictment was handed down in September 1992, followed by a 59–count superseding indictment in April 1993. Defendants were charged with RICO, kidnaping, conspiracy, extortion, murder, and firearms offenses. Olivieri, Palazzolo, Castelli, and Augustine pleaded guilty to various counts prior to trial. Brown, Green, and Cherry were fugitives at the time of trial but were later apprehended; Brown and Green pleaded guilty to the RICO conspiracy count.

Ruggiero, Cleary, and Aulicino were tried in a seven-week trial before an anonymous jury. Ruggiero and Cleary were convicted of, *inter alia*, RICO substantive and conspiracy offenses; various RICO-related offenses; firearms offenses; the kidnapings of, and conspiracy to kidnap and extort money from, Goings, Mercedes, and Crumpler; and conspiracy to kidnap Davila. Ruggiero was also convicted of the kidnaping of Delaney and conspiracy to kidnap and extort money from him. Cleary was also convicted of conspiracy to kidnap Carlos. Ruggiero was acquitted of conspiring to kidnap Simmons and Carlos, extort money from Simmons, and murder Mercedes and Crumpler, and of murdering Crumpler and committing certain firearms offenses. Cleary was acquitted of conspiring to murder Mercedes and kidnap Simmons. Aulicino, charged in only seven counts, was convicted of conspiracy to kidnap Davila and was acquitted on the other six counts. Defendants were sentenced as indicated above.

## II. DISCUSSION

On appeal, defendants contend principally that the evidence was legally insufficient to establish a RICO pattern, and that the district court erred in using an anonymous jury, in admitting various items of evidence, and in instructing the jury. In addition, Aulicino challenges the sufficiency of the evidence to convict him of conspiracy to kidnap Davila; and Ruggiero and Aulicino challenge their sentences. We find no basis for reversal.

### A. Admission of Vincent Moscatello's Testimony Against Ruggiero

At trial, the government introduced the testimony of Vincent Moscatello, who was a cell mate of Cleary for more than a month in the summer of 1991 in a jail in Bergen

County, New Jersey, where Cleary had been arrested on an unrelated matter prior to his arrest on the present charges. Moscatello had not theretofore known Cleary, but they had several mutual acquaintances, including Castelli, Palazzolo, and someone Cleary was with when Moscatello first met him in the Bergen County jail holding pen. Moscatello testified that during the period in which they were cell mates, Cleary described his arrest in Queens and his involvement in the kidnapings of well-heeled men who were engaged in narcotics trafficking and other illegal businesses.

According to Moscatello, Cleary said his group "would arrest them, make like they were the cops," and then "would hold them, bring them someplace, hold them and they would, they would get somebody to call from that individual[,] to call for ransom." (Tr. 998.) Moscatello testified that Cleary said he had "gotten involved through Louie Ruggiero." (Tr. 999.) The victims were identified by a Bronx-based crew whose leader Ruggiero knew; the ring targeted 10 victims and expected to receive ransoms of a million dollars from each victim. Cleary said he had not participated in the ring's first kidnaping, which Ruggiero had botched:

> Louie had did [*sic*] a kidnapping first. David didn't want to get involved at first. Louie had did [*sic*] the kidnapping on his own, and he had a little trouble with it. He was on the phone making a phone call to the family, and the victim that he had in the hotel was handcuffed to a chair, went running down the block past him as he was on the phone calling the person's family.

(*Id.*) Cleary told Moscatello that in the next kidnaping, the first in which Cleary participated, the ring had received a $1 million ransom, shared by the Bronx-based crew, Palazzolo, Olivieri, Cleary, and Ruggiero. Cleary had also described a meeting in the Bronx attended by Cleary, Ruggiero, and other members of the two crews, when one of their victims was being held in the trunk of one of the cars; and he said Ruggiero had been among the ring members arrested in Queens while lying in wait to kidnap the numbers banker.

Cleary did not testify at trial, and Ruggiero contends that the admission of the testimony of Moscatello as to Cleary's statements about Ruggiero violated Ruggiero's rights under the Confrontation Clause of the Constitution. The parts of Cleary's statements that were not merely inculpatory of himself would perhaps not be admissible against Ruggiero pursuant to Fed.R.Evid. 804(b)(3) under the analysis of *Williamson v. United States,* —— U.S. ——, ——–——, 114 S.Ct. 2431, 2435–37, 129 L.Ed.2d 476 (1994) (statement to police officer incriminating another is not a statement against declarant's penal interest within the meaning of Rule 804(b)(3), even if it is included within a broader narrative that is generally self-inculpatory), and hence might ordinarily raise Confrontation Clause problems, *see Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990) (hearsay evidence not falling within firmly rooted hearsay exception is " 'presumptively unreliable and inadmissible for Confrontation Clause purposes' ") (quoting *Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986)); *United States v. Matthews,* 20 F.3d 538, 544–46 (2d Cir.1994). Testimony admitted over a defendant's valid Confrontation Clause objection, however, is subject to harmless-error analysis. *See generally Delaware v. Van Arsdall,* 475 U.S. 673, 681–84, 106 S.Ct. 1431, 1436–38, 89 L.Ed.2d 674 (1986) (Confrontation Clause violation subject to harmless-error analysis, considering, *inter alia,* the strength of the properly admitted evidence against the defendant and whether the improperly admitted testimony was cumulative). And if the defendant has failed to object, the admission of evidence in violation of his Confrontation Clause rights is ground for reversal only if it constitutes plain error. *See* Fed.R.Crim.P. 52(b). Plain error warrants reversal "solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982); *see United States v. Locascio,* 6 F.3d 924, 942 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994); *United States v. Wilkinson,* 754 F.2d 1427, 1432 (2d Cir.), *cert. de-*

*nied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

■ In the present case, Moscatello's testimony was admitted without objection from Ruggiero at trial, and Ruggiero has made no showing that its admission resulted in a miscarriage of justice, or indeed that any error in its admission could be considered other than harmless. Except for the statements that Cleary had gotten involved in the ring because of Ruggiero and that Ruggiero was the person who had previously known the leader of the other crew, the Cleary statements recounted by Moscatello presented no new evidence against Ruggiero. The other Cleary statements described Ruggiero's farcical first attempted kidnaping, and stated that Ruggiero had shared in the ransom that was collected in the second kidnaping, and that Ruggiero had participated in one other kidnaping and in the kidnaping attempt that ended in their arrests in Queens. The non-hearsay evidence as to Ruggiero's participation in these events and others was far more detailed and compelling. For example, Augustine testified that during the course of the conspiracy, he had 40–50 face-to-face meetings with Ruggiero; that Ruggiero was in attendance at all of the meetings held to plan the kidnaping attempts; that he observed Ruggiero participating in a number of the kidnapings or attempted kidnapings; and that it was Ruggiero who told members of the Palmer crew to come get Crumpler from the Ruggiero/Cleary crew when Crumpler refused to pay. Van Dyke testified that he observed Ruggiero and Cleary, among others, planning the Davila kidnaping; and Van Dyke rode in the car with Ruggiero and Cleary to Davila's house where they were all arrested. Other evidence as to Ruggiero's participation in the Delaney kidnaping included Ruggiero's handwriting on the motel registration card for the room in which Delaney had been kept, the identification of Ruggiero by the motel desk clerk and two guests as the kidnaper pointed out by Delaney, and wiretap tapes in which Ruggiero and Cleary, and Ruggiero and "Tommy," his accomplice in the Delaney kidnaping, discussed the kidnaping.

We conclude that the unobjected-to admission of the Moscatello testimony against Ruggiero was not plain error and was harmless.

### B. *The RICO Pattern Challenge*

Ruggiero and Cleary contend that their RICO substantive and conspiracy convictions should be reversed on the ground that the government failed to prove that they engaged in a "pattern of racketeering activity" within the meaning of RICO. They argue (a) that the evidence showed that they conducted their kidnapings and attempted kidnapings only over a period of some 3½ months, a period they contend is too short to show a RICO pattern, and (b) that because the enterprise ended before the present prosecution commenced, the government failed to prove any threat of continuity. We disagree.

RICO prohibits, *inter alia,* the conduct of or participation in the affairs of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The term "racketeering activity" includes felonious "act[s] or threat[s] involving murder, kidnaping, ... [or] extortion." *Id.* § 1961(1). The term "pattern of racketeering activity" is defined as "requir[ing] at least two acts of racketeering activity" within 10 years of each other. *Id.* § 1961(5). As the Supreme Court noted in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) ("*H.J. Inc.*"), § 1961(5) sets "only the minimum *number* of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved." 492 U.S. at 238, 109 S.Ct. at 2900 (emphases in original). The precise scope and contour of that "something ... *beyond,*" however, have proven elusive.

In *H.J. Inc.,* the Supreme Court stated that, in order to establish a pattern of racketeering activity, a party must show that the racketeering predicate acts are not isolated or sporadic but are related, and "that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *Id.* at 240, 109 S.Ct. at 2901 (emphasis in original). The *H.J. Inc.* Court, reviewing a ruling that the

RICO pattern element required proof of multiple "schemes," held that the pattern element did not require a plaintiff to prove that the defendant engaged in more than one scheme, stating that "[w]hat a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.*" *Id.* at 241, 109 S.Ct. at 2902. Continuity itself and the "threat" of continuity have not proven to be simple concepts.

In *H.J. Inc.*, the Court stated that continuity or its threat "may be [proven] in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity." *Id.* In general, the Court stated, "continuity"

> is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 241–42, 109 S.Ct. at 2902 (emphases in original). The *H.J. Inc.* Court stated that a threat of continuity exists, for example, where the predicate acts "include a specific threat of repetition extending indefinitely into the future," *id.* at 242, 109 S.Ct. at 2902, or where the acts form "part of a long-term association that exists for criminal purposes," *id.* at 243, 109 S.Ct. at 2902, or where the acts constitute "a regular way of conducting [an] ongoing legitimate business," *id.* With respect to duration, the *H.J. Inc.* majority

stated that "very short periods of criminal activity that do *not* in any way carry a threat of continued criminal activity" do not constitute racketeering to which Congress intended RICO to apply. *Id.* at 243 n. 4, 109 S.Ct. at 2902 n. 4 (emphasis in original).

The *H.J. Inc.* Court preceded the above examples with an express disavowal of "any claim to cover the field of possibilities," *id.* at 242, 109 S.Ct. at 2902, stating that it was preferable to "deal with this issue in the context of concrete factual situations presented for decision," *id.* Since Congress intended the courts to take a "flexible approach," *id.* at 238, 109 S.Ct. at 2900, the sufficiency of a party's proof of a threat of continuity will "depend[ ] on the specific facts of each case," *id.* at 242, 109 S.Ct. at 2902.

In the wake of *H.J. Inc.*, the lower courts have struggled with the Supreme Court's view that periods of "a few weeks or months" may not be sufficient to show a RICO pattern. As discussed below, in cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering acts was short. In contrast, in cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, the courts generally have found no threat of continuing criminal activity arising from conduct that extended over even longer periods.

For example, in *United States v. Simmons*, 923 F.2d 934 (2d Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991), we found a RICO pattern established by three murders, the first preceding the latter two by some nine months. We saw no need, however, to discuss the time span in which the killings had occurred, noting that since they were intended chiefly to maintain discipline within a narcotics trafficking enterprise, "by their very nature these acts threatened repetition and thereby satisfied the con-

tinuity prong of the pattern requirement." *Id.* at 951. In *United States v. Coiro,* 922 F.2d 1008 (2d Cir.), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991), without discussing the period involved, we found that proof of a defendant's "numerous activities involving bribery and money laundering on behalf of organized crime," which were "part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention," was "more than ample to establish ... continuity." *Id.* at 1017; *see also id.* (" '[w]here the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity' " (quoting *United States v. Indelicato,* 865 F.2d 1370, 1383–84 (2d Cir.) (en banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24, 25 (1989), in which three simultaneous murders by an organized crime group were held sufficient to meet the continuity requirement)).

In contrast, in *Metromedia Co. v. Fugazy,* 983 F.2d 350, 368–69 (2d Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993), which involved the sale of 80% of a business, rather than any inherently unlawful goal, we noted that the trial court's instruction to the jury that " 'a few weeks or months' might constitute a 'substantial period of time' " was erroneous. *Id.* at 369; *see also id.* (upholding RICO verdict in favor of the plaintiffs because the predicate acts of securities and bankruptcy fraud found by the jury spanned not just weeks or months but years, and the erroneous instruction was therefore harmless).

In *United States v. Busacca,* 936 F.2d 232 (6th Cir.), *cert. denied,* 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991), a pension fund official was charged with violating RICO by embezzling funds to pay for his defense of a prior criminal prosecution. The Sixth Circuit found the evidence sufficient to establish the continuity aspect of the pattern element despite the fact that the defendant had obtained funds illegally only during a two-month period, for "[t]he manner in which the embezzlements occurred was capable of repetition indefinitely into the future, as long as there were either legal fees or other expenses which Busacca wanted paid." *Id.* at 238. Though Busacca contended that there was no threat of continuity because his opportunity to embezzle had ended with his prior conviction and consequent removal from office, the *Busacca* court noted that the "analysis of the threat of continuity cannot be made solely from hindsight." *Id. But see Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1545 (10th Cir.1993) (threat of continuity measurable "as of the time suit is filed").

In contrast to its holding in *Busacca* that a two-month period of embezzlement sufficed to evince a threat of continuity, the Sixth Circuit in *Vemco, Inc. v. Camardella,* 23 F.3d 129 (6th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 579, 130 L.Ed.2d 495 (1994), saw no threat of continuity where the alleged construction-contract fraud spanned 17 months. The court reasoned that the fraud was aimed at obtaining payment for "*one* paint system," and then "its scheme would be over." *Id.* at 134–35 (emphasis in original). *See also Thompson v. Paasche,* 950 F.2d 306, 311 (6th Cir.1991) (no threat of continuity where the defendant's goal was sale of certain land, and five-month allegedly fraudulent scheme with regard to the sale was "an inherently short-term affair").

In *United States v. O'Connor,* 910 F.2d 1466 (7th Cir.1990), *cert. denied,* 498 U.S. 1082, 111 S.Ct. 953, 112 L.Ed.2d 1041 (1991), the Seventh Circuit held that several predicate acts of extortion committed by a policeman during a two-month period that ended with his arrest were sufficient to form a pattern of racketeering activity because the policeman "had committed himself to an enduring series of criminal acts." *Id.* at 1468. In contrast, in *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771 (7th Cir. 1994), the court held that nine months was insufficient where the defendant's activity was selling and leasing equipment to the plaintiff pursuant to a vendor agreement. Though the complaint alleged that the defendant had pursued that goal by means of a fraudulent scheme, the court ruled that the sales and leases constituted "a clearly defined, discrete, and finite" project that "import[ed] no inherent threat of continuing mis-

conduct." *Id.* at 783 (internal quotes omitted). *See also Religious Technology Center v. Wollersheim,* 971 F.2d 364, 366 (9th Cir. 1992) (no threat of continuity where only goal of alleged racketeering conduct was successful prosecution of a single lawsuit); *Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 610–11 (3d Cir.1991) (no threat of continuity where there was no evidence that defendants "formed an on-going criminal association" and alleged fraudulent scheme was to obtain favorable prices from plaintiffs with regard to a single tract of land), *cert. denied,* —— U.S. ——, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992); *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 45–47 (1st Cir.1991) (no threat of continuity where misrepresentation to plaintiffs at 25 real-estate closings spanned no more than three-to-four months); *Pyramid Securities Ltd. v. IB Resolution, Inc.,* 924 F.2d 1114, 1119–20 (D.C.Cir.) (no threat of continuity where opportunity to churn brokerage account arose only during plaintiff's three-to-four-month honeymoon), *cert. denied,* 502 U.S. 822, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991).

■ Ruggiero and Cleary zoom in on *H.J. Inc.*'s statements that Congress intended RICO to reach only activities amounting to or threatening "long-term" criminal activity, rather than "very short periods" of criminal activity that last only "a few weeks or months"; and they argue that their enterprise's series of kidnapings did not constitute a RICO pattern because their repeated conduct did not extend over a "substantial period of time," and, having been abandoned after 3½ months, did not "by its nature project[ ] into the future with a threat of repetition." In effect, Ruggiero and Cleary argue that *H.J. Inc.* holds that Congress granted them a RICO-free window of opportunity to engage in numerous racketeering acts, provided that they stopped of their own volition after a few weeks or months. We reject this view.

While the history of the kidnaping enterprise at issue here does not match the continuity examples given by the *H.J. Inc.* Court, those examples were intended to be illustrative, not definitive, and *H.J. Inc.* instructs us to determine continuity with reference to the specific facts of each case. For several reasons, the facts of the present case leave no room for doubt that the ring engaged in a pattern of racketeering activity within the contemplation of Congress in enacting RICO.

First, there was nothing isolated or sporadic about the acts of racketeering performed by the enterprise in the present case. There was evidence that the ring drew up a list of 10 kidnaping targets. The ring planned to abduct its victims seriatim and aspired to ransoms of $1 million per victim. They used proceeds from their successful kidnaping to buy and customize vehicles for the kidnapings to follow. The very plan to undertake a series of inherently unlawful and interrelated racketeering acts is instinct with the threat of continuity.

Second, the kidnapings here were especially likely to involve further criminal activity. It is not uncommon for a kidnaping to result in the kidnapers' killing their victim in order to prevent his later identifying the kidnapers. The likelihood of victim identification of the kidnapers in the present scheme was heightened by the ring's modus operandi, with members of the ring pretending to be police officers and thus approaching their intended victims openly. Thus, this ring's kidnaping activities carried a high threat of further criminal activity, to wit, murder. Indeed, the coconspirators decided to kill Mercedes (which they attempted unsuccessfully) and Crumpler (successfully) precisely for fear that the victims, if allowed to go free, would be able to identify the ring members who had "arrested" them.

In addition, though actual kidnaping attempts were made only from mid-December 1990 through March 31, 1991, a period of some 3½ months, there is no basis for viewing the ring's activities as having reached a natural end. The ring had begun with a list of 10 proposed victims; even assuming that the ring meant to stop after 10 kidnapings, it did not even exhaust its initial list. The ring members made attempts on only seven of its targets. Further, the circumstances were unlike those in which a defendant had a piece of property the sale of which, even if by fraudulent means, provided a natural end to his project. There was no reason the ring

could not attempt to kidnap additional individuals any time the ring members wanted more money. Indeed, there was no inherent reason the ring could not attempt to kidnap the same individual more than once (assuming the victim had not been killed). For example, ring members continued to attempt to extort money from Delaney even after he escaped, and they threatened to kidnap him again.

Finally, though the last kidnaping (and last actual attempt) occurred at the end of March, Ruggiero and Augustine discussed making another attempt near the end of May. The kidnapings appear to have ended for lack of Palmer's leadership; the discussions of further attempts appear to have ended because of the fears of Ruggiero, Cleary, and Augustine that the authorities might be on their trail or because of Cleary's arrest on other charges in June and Augustine's subsequent flight from New York. The ring's activities were abandoned; they were not a discrete and finite project that came to a natural end.

The trial court instructed the jury that, in order to constitute a RICO pattern, the "racketeering acts may not be isolated or disconnected, but must ... amount to or pose a threat of continued criminal activity." (Tr. 3109.) The jury could easily find the threat of continued criminal activity from the evidence that the ring made an average of one kidnaping attempt every two weeks for 14 weeks, made repeated extortion attempts where the kidnapings had failed to extract ransoms, and had not exhausted its list of kidnaping targets.

## C. Aulicino's Sufficiency Challenge

Aulicino, who was convicted only of conspiracy to kidnap Davila, contends that the evidence was insufficient to support that conviction. Though he concedes that when the kidnaping was to occur he was present (a forced concession, since he was arrested with the five others who were lying in wait outside of Davila's house), Aulicino testified that he was unaware at that time that there was to be a kidnaping, believing instead that he was merely to assist in the collection of a debt that Davila owed Olivieri. Viewing all of the evidence, direct and circumstantial, in the light most favorable to the government, see, e.g., Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United ed States v. Gordon, 987 F.2d 902, 906 (2d Cir.1993), crediting all inferences and credibility assessments that the jury might have drawn in favor of the government, see, e.g., United States v. Matthews, 20 F.3d at 548; United States v. Gordon, 987 F.2d at 906; United States v. Stratton, 779 F.2d 820, 828 (2d Cir.1985), cert. denied, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); United States v. LeRoy, 687 F.2d 610, 616 (2d Cir. 1982), cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983), and viewing the evidence as a whole rather than piecemeal, see, e.g., United States v. Brown, 776 F.2d 397, 403 (2d Cir.1985), cert. denied, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir.1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), we reject Aulicino's sufficiency challenge.

■ Preliminarily, we note that the government argues that Aulicino's sufficiency challenge "is barred because of his decision to testify at trial." (Government brief on appeal at 52.) We reject this simplistic contention. It is true that by testifying in his own behalf at trial, a defendant waives his right to have sufficiency assessed on the basis of the government's presentation alone. See, e.g., United States v. Maniego, 710 F.2d 24, 28 (2d Cir.1983); United States v. Keuylian, 602 F.2d 1033, 1040–41 (2d Cir.1979); United States v. Pui Kan Lam, 483 F.2d 1202, 1208 n. 7 (2d Cir.1973), cert. denied, 415 U.S. 984, 94 S.Ct. 1577, 1578, 39 L.Ed.2d 881 (1974). The defendant's testimony may thus add weight to the government's case. See, e.g., United States v. Stanley, 928 F.2d 575, 577 (2d Cir.) ("the jury [is] entitled to disbelieve [the defendant's] testimony, and use its disbelief to *supplement* the other evidence against him" adduced by the government (emphasis added)), cert. denied, 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991); United ed States v. Tyler, 758 F.2d 66, 69 (2d Cir. 1985) ("the jury has a right to consider the defendant's lack of credibility in reaching its verdict"). But a verdict of guilt cannot prop-

erly be based solely on the defendant's denial of the charges and the jury's disbelief of his testimony. "'When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.'" *Id.* at 70 n. 3 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984)); *see also United States v. Zimmitti*, 850 F.2d 869, 876 (2d Cir.1988) (government cannot prove that an event occurred simply by putting a witness on the stand, allowing him to testify that the event did not occur, and asking the jury to disbelieve that testimony). Our rejection of the government's overly simplified statement, however, does not aid Aulicino, for the jury was presented with affirmative evidence of his knowing participation in the conspiracy to kidnap Davila.

■ The government's proof included testimony by Conklin as to his participation with Aulicino in the abortive attempts to kidnap Davila and Carlos. Though Conklin supported Aulicino's testimony that Aulicino was initially not aware that what was planned was a kidnaping, Aulicino himself testified that immediately after the abortive attempt on Carlos, Conklin told him they were not just trying to enforce a debt but "were intending on snatching somebody." (Tr. 1975.) Aulicino testified, "I didn't know what that meant, so I asked him and he said that ... snatching meant kidnapping." (*Id.*) The Davila attempt followed. Though Aulicino claims that he was again told by Palazzolo, who was his best friend, and Olivieri that he would be assisting merely in the collection of a debt, there was other evidence that Aulicino was involved in the planning of the Davila kidnaping. Van Dyke testified that one of the meetings held to plan that kidnaping took place at a fruit stand in the Bronx and was attended by five members of the Ruggiero/Cleary crew; though Van Dyke knew only four of these men, he saw the same five assembled at the Wendy's restaurant just prior to the approach to Davila's house. This testimony, in conjunction with Augustine's testimony that Van Dyke and the five Ruggiero/Cleary crew members who were at the Wendy's made the approach to Davila's

house, and the evidence that the five Ruggiero/Cleary crew members who shortly thereafter were arrested near Davila's house included Aulicino, easily permitted the jury to infer that Aulicino was present not only at the attempted execution of the Davila kidnaping but also at its planning. These facts, added to the evidence that Aulicino had been informed that the prior excursion in which he participated was an attempted kidnaping, sufficed to permit the inference that Aulicino was a knowing participant in a conspiracy whose goal he knew was a kidnaping.

■ We also reject Aulicino's contention that the district court erred in giving a "conscious avoidance" charge with respect to his knowledge that he was participating in a kidnaping. Such a charge is appropriate where the defendant claims to lack "some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance." *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir.), *cert. denied*, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986); *see United States v. Mang Sun Wong*, 884 F.2d 1537, 1541 (2d Cir.1989), *cert. denied*, 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990); *United States v. Civelli*, 883 F.2d 191, 194–95 (2d Cir.), *cert. denied*, 493 U.S. 966, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989). An adequate evidentiary foundation for the charge exists when a rational juror could conclude beyond a reasonable doubt that the defendant "was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir.1993). Where there is sufficient evidence that the defendant was a member of a conspiracy, a conscious-avoidance instruction may properly be given, permitting the jury to convict if it finds that the defendant deliberately attempted to remain ignorant of the conspiracy's precise goals. *See, e.g., United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *United States v. Lanza*, 790 F.2d at 1022–23. It is plain in this case that the government's evidence and Aulicino's testimony provided an appropriate basis for the delivery of a con-

scious-avoidance charge with respect to his claimed lack of knowledge that a goal of the conspiracy he joined was kidnaping.

#### D. *Other Contentions*

Defendants' other contentions include challenges to the use of an anonymous jury, to an alleged violation of their right to counsel, and to the calculations of the sentences of Ruggiero and Aulicino. We reject all of their challenges.

#### 1. *The Use of an Anonymous Jury*

Jury anonymity may be warranted when the jury needs protection, as when, for example, the government has demonstrated a defendant's "willingness ... to tamper with the judicial process." *United States v. Vario*, 943 F.2d 236, 240 (2d Cir.1991), *cert. denied*, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *see United States v. Tutino*, 883 F.2d 1125, 1132 (2d Cir.1989) ("substantial showing that there was a risk of jury tampering"), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). In such circumstances, the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a careful *voir dire* designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities. *See, e.g., United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *United States v. Vario*, 943 F.2d at 239; *United States v. Thomas*, 757 F.2d 1359, 1365 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985). The district court has discretion to determine whether or not an evidentiary hearing is needed on the government's allegations. *See, e.g., United States v. Paccione*, 949 F.2d at 1192; *see also Hayden v. United States*, 814 F.2d 888, 892 (2d Cir.1987) (habeas petitioners' hearsay assertions of jury tampering did not warrant evidentiary hearing).

In the present case, the government supported its request for an anonymous jury with a variety of proffers, including the testimony of Augustine that Ruggiero, Cleary,

Olivieri, and Palazzolo, while in pretrial detention, sought to have him offer Mercedes $50,000 not to testify against them, and that Cleary told Augustine that if the offer were rejected, Mercedes would be killed. Augustine was drafted to find a go-between who could communicate the offer to Mercedes. The plan was aborted only when Ruggiero and Cleary became suspicious of the person produced by Augustine as a go-between (who was in fact an undercover police officer). The government also proffered corroborating information from another cooperating witness, along with evidence of attempts by Ruggiero and Cleary to influence a witness in a prior state prosecution, and tape-recorded statements by Ruggiero to Cleary suggesting that Ruggiero's father would interfere with the judicial process on Ruggiero's behalf. Though defendants contend that the court should have held a hearing as to whether jury tampering was likely, they concede that they could not show that the tape-recorded conversation between Ruggiero and Cleary did not occur and that they would merely have sought to cast it in an innocent light. In all the circumstances, we see no error in the court's granting of the government's motion without a hearing.

Though defendants also contend that the district court's explanation to the jury as to the need for anonymity was insufficient, the record reveals that the court gave the jurors, at the outset of jury selection, a plausible and nonprejudicial reason for not disclosing their identities. In any event, defendants made no request for any additional or different explanation and hence may not be heard to complain now.

Finally, Aulicino contends that as there was no proffer of evidence linking him to any efforts to obstruct justice, the court, once it decided on an anonymous jury, should have granted his motion for a separate trial. We disagree. There is a preference in the federal system for the joint trial of defendants indicted together, making severance inappropriate unless a joint trial would compromise a trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence. *See Zafiro v. United States*, —— U.S. ——, ——, 113

S.Ct. 933, 937–38, 122 L.Ed.2d 317 (1993). In order to secure a reversal for denial of a severance motion a defendant must show that the denial of his motion constituted an abuse of discretion, *see, e.g., id.* at ——, 113 S.Ct. at 938; *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Casamento,* 887 F.2d 1141, 1149 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), and that it resulted in prejudice so severe that his conviction constituted a miscarriage of justice, *see, e.g., United States v. Rosa,* 11 F.3d 315, 341 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994); *United States v. DeVillio,* 983 F.2d 1185, 1192 (2d Cir.1993); *United States v. Lasanta,* 978 F.2d 1300, 1306 (2d Cir.1992). A jury's acquittal of a defendant on one or more counts is strong evidence that joinder did not result in prejudice. *See, e.g., United States v. Paccione,* 949 F.2d at 1193.

■ In light of our conclusion that the use of an anonymous jury was based on sufficient evidence of potential jury tampering by Aulicino's coconspirators and was accompanied by an adequate proffer to the jury of a nonprejudicial reason for anonymity, we conclude that Aulicino's due process rights were not violated even in the absence of evidence that he in particular had sought to obstruct justice. Further, the fact that Aulicino was acquitted on six of the seven counts in which he was charged belies his conclusory assertion that the joint trial before an anonymous jury caused him prejudice.

### 2. *The Sixth Amendment Claim*

■ Defendants contend that their Sixth Amendment rights to counsel were violated by Augustine's attendance at a joint defense meeting after Augustine had begun negotiations with the government to act as a cooperating witness, *see Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and that the district court improperly rejected this contention without a hearing. In order to require a hearing on such a claim, assuming that the government has not interfered with the attorney-client relationship deliberately, the defendant bears the burden of "alleg[ing] specific facts that indicate communication of privileged information to the prosecutor and prejudice resulting therefrom." *United States v. Ginsberg,* 758 F.2d 823, 833 (2d Cir.1985). Defendants did not meet this burden here.

■ The government presented evidence of the steps it took to insulate the attorneys prosecuting the case from any knowledge gained by Augustine from his contacts with the codefendants after he agreed to cooperate. Defendants did not present any evidence to suggest that Augustine revealed any privileged information to the government. Ruggiero's statement that he had no way of knowing the extent of any prejudice defendants might have suffered, supported only by speculation that they "may well have been severely prejudiced" (Ruggiero brief on appeal at 22), was insufficient to require a hearing.

### 3. *The Sentencing Challenges*

Ruggiero and Aulicino challenge the district court's determinations as to their respective roles in the offenses. These contentions need not detain us long.

Ruggiero contends that the court erred in increasing his offense level by four steps on the basis that he was an organizer or leader of a criminal enterprise comprising five or more individuals. This contention has not been preserved for appeal, as it was not raised in the district court. In any event, it is meritless.

■ Aulicino contends here, as he did in the district court, that his offense level should have been reduced on the basis that he was at most a minor actor. We find no error in the district court's rejection of this contention.

The court correctly pointed out that the issue with respect to Aulicino was only his role in the Davila kidnaping attempt, not his relationship to the ring's other activities. With respect to the Davila attempt, the court found that Aulicino was aware that he was participating in a kidnaping, a finding that was supported by the evidence we have discussed in Part II.C. above. The court noted that in the car in which Palazzolo, Olivieri, and Aulicino approached Davila's house, there were, along with police shields and handcuffs, three pairs of gloves and three

handguns, and it found that Aulicino's assignment was to pose as a police officer. On the basis of these findings, the court concluded that "Aulicino's role in the offense did not differ significantly from any of the individuals he was arrested with." (Aulicino Sentencing Transcript at 40.) We see no basis for disturbing the district court's findings, its conclusion, or its refusal to consider Aulicino a minor or minimal participant in the conspiracy to kidnap Davila.

## CONCLUSION

Defendants also make a variety of other contentions, none of which requires discussion. We have considered all of their arguments on these appeals and have found in them no basis for reversal. The judgments of conviction are affirmed.