**ANDREA DOREEN LTD., Dorothy Loguidice, J.C.S. Enterprises, Inc., Jack C. Stuart, J.C.S. Construction Co., Inc., Conroc Recycling Corp., Michael Loguidice, Ultimate Demolition, Inc., and Paul Scaglione, Plaintiffs,**

v.

**BUILDING MATERIAL LOCAL UNION 282, affiliated with the International Brotherhood of Teamsters, Tom Gesualdi, Paul Gattus, Dennis Gartland, Sr., Gary Labarbera, Lawrence Kudla and Others as Trustees and Fiduciaries of Local 282 Welfare, Pension, Annuity, Job Training, Vacation and Sick Leave Trust Funds, Defendants.**

No. CIV.A. 98–4838–WGY.

United States District Court, E.D. New York.

Feb. 2, 2004.

L. Susan Slavin, Slavin, Angiulo & Horowitz, LLP, Jericho, NY, Steven M. Coren, Coren & Braun, P.C., New York, NY, Anthony V. Barbiero, Anthony V. Barbiero, P.C., East Islip, NY, Robert G. Lipp, Franklin & Gringer, P.C., Garden City, NY, L. Susan Slavin, for Andrea Doreen, Ltd., Dorothy Loguidice, Plaintiffs.

William K. Wolf, Michael Bauman, Erinn Weeks Waldner, Friedman & Wolf, Bruce S. Levine, Rachel S. Paster, Cohen Weiss and Simon, New York City, NY, for Defendants.

*MEMORANDUM AND ORDER*

WILLIAM G. YOUNG, District Judge.[1]

## I. INTRODUCTION

The Plaintiffs, Andrea Doreen Ltd., Dorothy Loguidice, J.C.S. Enterprises, Inc., Jack C. Stuart, J.C.S. Construction Co. Inc., CONROC Recycling Corp., Michael Loguidice, Ultimate Demolition, Inc. and Paul Scaglione (collectively "Doreen") brought suit under the Racketeer Influence and Corrupt Organization Act, 18 U.S.C. § 1961 et seq. ("RICO"), against Building Material Local Union 282 ("Local 282") and the Trustees and Fiduciaries (the "Trustees") of Local 282's Welfare, Pension, Annuity, Job Training, Vacation and Sick Leave Trust Funds (the "Funds") (collectively the "Defendants"). This memorandum and order addresses the summary judgment motions made by the Trustees and Local 282 [Doc. Nos. 318, 324]. Pertinent to resolution of these matters, however, are (1) the arbitration decision, confirmed by this Court, regarding one of Local 282's counterclaims in the instant RICO action, *Andrea Doreen, Ltd. v. Building Material Local Union 282*, 250 F.Supp.2d 107 (E.D.N.Y.2003); and (2) the Court's findings and rulings and Doreen's admissions in a prior action brought by the Trustees against Doreen, *King v. JCS Enterprises, Inc.*, No. 94–4604 (E.D.N.Y. filed Sept. 30, 1994) (the "ERISA Collection Action").[2]

## II. BACKGROUND

### A. Procedural History

On March 22, 1995, Building Material Local Union 282 ("Local 282") entered a consent decree with the United States Government, acknowledging that it, and certain of its members, had acted as a criminal enterprise, in conjunction with organized crime. Amended Consent Judgment, Levine Decl. Tab 3, at 1 (noting that the original Consent Judgment was ordered by the District Court on or about March 22, 1995). The consent decree enjoined Local 282 from engaging in further criminal and racketeering misconduct. Local 282's Mem. in Supp. of Mot. for Summ. J. [Doc. No. 326] ("Local 282's Mem. in Supp.") at 4; Amended Consent Judgment, Levine Decl. Tab 3.

Between 1994 and 1996, the Trustees initiated four separate actions under section 502 of ERISA to collect fringe benefit contributions allegedly owed to the Funds by Doreen under a Collective Bargaining Agreement. Local 282's Mem. in Supp. at 10.[3] The four collection actions were consolidated under the ERISA Collection Action, No. 94–4604. In the first half of 1998, the Trustees and Doreen completed discovery in the ERISA Collection Action, and the Trustees moved for summary judgment. Doreen then brought this related RICO action before the Court, No. 98–4838, against Local 282 and the Trus-

---

1. Of the District of Massachusetts, sitting by designation.

2. On February 24, 2003, this Court denied Doreen's motion for a joint trial of all matters in this case with that in the ERISA Collection Action [Doc. No. 311]. It granted, however, Doreen's alternative request to proceed first with the ERISA Collection Action and then with this RICO action.

3. The original complaint was brought against JCS Enterprises (wholly owned by Jack Stuart) and JCS Construction (wholly owned

by Michael Loguidice) (collectively "JCS"). The Trustees, however, later alleged that Andrea Doreen and Conroc Recycling Inc. were JCS's alter egos and therefore jointly and severally liable for any delinquencies. Additionally, the Trustees claimed that Michael Loguidice and Dorothy Loguidice were individually liable. For the purposes of this memorandum and order, the defendants in the ERISA Collection Action and the plaintiffs in the RICO action are collectively referred to as "Doreen."

tees under 18 U.S.C § 1962(c).[4] In this action, Doreen alleges, *inter alia*, that the ERISA Collection Action was brought against it as part of a criminal extortion conspiracy and "a sham to retaliate against Doreen." Pls.' Mem. in Opp'n to Summ. J. [Doc. No. 337] ("Pls.' Mem. in Opp'n") at 3, 15, 22. In essence, Doreen claims that Local 282 and the Trustees have—during the time that the consent decree has been in place—engaged in a criminal conspiracy to retaliate against Doreen and put Doreen out of business for refusing to make unlawful payments. *Id.* at 3; *see Doreen,* No. 98–4838, 4–5 (E.D.N.Y. July 31, 2000) (order dismissing certain claims) [Doc. No. 170]; Local 282's Mem. in Supp. at 2.

On September 11, 2000, Local 282 filed a counterclaim against Doreen in the RICO action to collect wages that were allegedly past due to drivers under the Collective Bargaining Agreement. Local 282's Mem. in Supp. at 14, 10.[5]

On June 15, 2001, Local 282 moved for partial summary judgment and for an order to compel arbitration on the question of whether Doreen failed to pay proper wages [Doc. No. 230]. Doreen, on the same day, moved to dismiss Local 282's counterclaim based on laches, waiver, failure to meet a condition precedent, and lack of obligation under the Collective Bargaining Agreement to arbitrate [Doc. No. 231]. Pls.' Reply Mem. [Doc. No. 241] at 4.

Despite Doreen's arguments and defenses against arbitration, at the June 22, 2001 hearing, Judge Platt granted Local 282 partial summary judgment and directed Local 282 and Doreen to proceed to arbitration on all issues involved in this case, except the remaining RICO claim. Hearing Tr. [Docket 256] at 9–10, 14 (5/22/01). The arbitration order did not include the Trustees' claims in the ERISA Collection Action. Oct. 18, 2001 Letter from Judge Platt [Doc. No. 272].

On June 28, 2002, Arbitrator Richard Adelman issued an Opinion and Award finding Doreen liable for failing to pay wages due its drivers under the Collective Bargaining Agreement. Arbitration Opinion and Award, Tab 1 to Levine Decl. [Doc. No. 327], at 2, 15. Because the parties had agreed to bifurcate liability from remedy, *id.,* damages were not assessed at the time.

On July 1, 2002, the Trustees and Local 282 separately moved for summary judgement in the instant RICO case. On July 25, 2002, Doreen opposed this motion. On September 30, 2002, this Court held a summary judgment motion hearing via video conference[6] and took the matter under advisement.

---

4. Doreen also alleged a civil RICO violation under 18 U.S.C. § 1962(a), violations of the antitrust laws of the United states, breaches of Collective Bargaining Agreements, and tortious interference with Doreen's business relations. Pls.' Am. Compl. [Doc. No. 137]. These other claims, however, were dismissed by Judge Thomas C. Platt. *Doreen v. Local Union 282,* No. 98–4838, 4–5 (E.D.N.Y. July 31, 2000) (order dismissing certain claims) [Doc. No. 170].

5. This claim is different from that in the ERISA Collection Action. There, the Trustees claimed fund contribution delinquencies as opposed to actual wages past due.

6. Designated to sit as a visiting judge in the Eastern District of New York, this Court has handled 38 jury-waived matters via the video conferencing facilities of that court and the District of Massachusetts. Among these are four trials held, in whole or in part, via video conferencing, *Kesses v. Bicker,* No. 00–05325 (E.D.N.Y. filed Sept. 5, 2000); *Sung Jin Fasteners, Ltd. v. Northstar Equip. Corp.,* No. 99–3134 (E.D.N.Y. filed June 3, 1999) (appeal pending); *Davox Corp. v. Mfg. Admin. and Mgt. Sys.,* No. 98–5020 (E.D.N.Y. filed Aug. 4, 1998); *United States v. Mazzeo,* No. 98–3060 (E.D.N.Y. filed Apr. 22, 1998). This procedure, which promotes efficiency without sac-

On March 3, 2003, this Court confirmed the Arbitration Award and Opinion and directed Arbitrator Adelman to proceed to the remedy phase of the arbitration as quickly as possible. *Doreen*, 250 F.Supp.2d at 116.

From May 12 through May 16, 2003, this Court conducted a bench trial in the related ERISA Collection Action, *King v. JCS Enterprises, Inc.*, No. 94–4604. The relevant findings and rulings of the Court are that: (1) the defendants in the ERISA Collection action case, Doreen, manifested an intent to adopt the Collective Bargaining Agreement for the period of 1993–1996 notwithstanding that no agreement was signed. Trial Tr. Vol. 5 at 556:11–17 (5/16/03); (2) the Trustees proved that Doreen failed to maintain adequate records as matter of law and as such violated ERISA, Section 209, 29 U.S.C. § 1059. *Id.* at 558:1–6;(3) Doreen waived the written demand requirement found in the Collective Bargaining Agreement "by [its] conduct in urging the joint review of ... the records in the course of these proceedings, the conduct that led up to the KPMG report." *Id.* at 559:1–15 (remarking that "statutory requirements of such payments into pension funds by ERISA cannot be frustrated by the Trustees' failure strictly to follow the requirements of the Collective Bargaining Agreement");[7] (4) the Trustees proved that Doreen failed to made adequate contributions to the pension plans as required by the governing Collective Bargaining Agreement. *Id.* at 558:15–25; and (5) the KPMG report is an adequate and reasonable basis for concluding what sums are owed by Doreen. *Id.* at 561:20–24.[8] Following the conclusion of the trial, Doreen moved for reconsideration of the Court's prior findings that the KPMG report was an adequate and reasonable basis for determining the sums owed.[9] The Court denied this motion.

rificing justice, is also followed in the District of Arizona (20 cases), the Middle District of Florida (13 cases), and the District of Maryland (1 case).

7. In February 1999, KPMG was jointly retained by Doreen and the Trustees to conduct an independent review of both parties' records to determine if Doreen owed benefit contributions. KPMG Report, Tab 37 to Levine Decl., at 2; Arbitrator Award and Opinion, Tab 1 to Levine Decl., at 3. The KPMG auditor concluded that both Doreen's and the Trustees' records were insufficient because they were incomplete or lacked corroborating data such as employee time cards and time sheets. As a result, KPMG relied on independent third party documents and records such as dump tickets, certified payroll reports and purchase/sales records from third parties. KPMG Report, Tab 37 to Levine Decl., at 3. Both parties were appraised of the process and methodology used by KPMG and both parties cooperated. *Id.* at 4–7; Arbitrator Award and Opinion, Tab 1 to Levine Decl. at 4. In December of 1999, KPMG concluded that Doreen underpaid the required remittances to the various Funds. KPMG Report, Tab 37 to Levine Decl., at 21. After fixing a calculation error, the amount owing was found to be at least $98,000 in fund contributions. Arbitrator Award and Opinion, Tab 1 to Levine Decl., at 4.

8. Although the Court found that the methodology of the KPMG report was "reasonable and logical," it noted that Doreen had succeeded, in part, in demonstrating that there might have been a more precise calculation if the contributions owed had been based entirely on the dump tickets and truck logs or Jack sheets. Trial Tr. Vol. 5 at 562–564. The Court explained that these sources were not used by KPMG because Doreen had improperly destroyed many of the pertinent records. *Id.* at 563. Therefore, the Court directed the parties to use the dump tickets and truck logs where possible but "in default of more accurate documentation, the KPMG report governs." *Id.* at 564:24–25.

9. Doreen's motion for reconsideration was based on alleged errors in the third party sales records relied on by KPMG. These records were used in lieu of other primary sources, in part, because Doreen had willfully destroyed such sources. The Court refused to reconsider its findings and rulings.

Subsequently, the parties agreed that Doreen owed the Trustees a sum of $108,108 in delinquent contributions plus interest, additional interest or liquidated damages, and attorneys fees and costs, as calculated under the requirements of ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2). 7/11/03 Barbiero Letter; 7/15/03 Bauman Letter. The Court adopted this agreement, applied a six percent interest rate to the amount and entered judgment that JCS, Andrea Doreen, and Conroc, jointly and severally, and Michael Loguidice and Dorothy Loguidice, individually, are liable to the Trustees for the amount of $204,662 plus attorneys fees and costs. *King v. JCS Enterprises,* 288 F.Supp.2d 287, 291 (E.D.N.Y.2003).

## B. Doreen's RICO Claims and Supporting Facts

Because Local 282 and the Union moved for summary judgment, the following facts are presented in the light most favorable to Doreen and all reasonable inferences are drawn in Doreen's favor. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sutera v. Schering Corp.,* 73 F.3d 13, 15 (2d Cir.1995) (citations omitted).

Doreen claims that Local 282 and the Trustees violated 18 U.S.C. § 1962(c) by conducting an enterprise through a pattern of racketeering activity. Am. Compl.

[Doc. No. 137] at 21. More specifically, it claims that the Defendants engaged in a pattern of extortion, threats, damage to property, illegal union activity and systematic mail and wire fraud directed against Doreen because Doreen refused to pay bribes "or otherwise play ball" with them. Pls.' Mem. in Opp'n [Doc. No. 337] at 22. Doreen's main theory is that Local 282 used its relationship with the Trustees and the Trust Funds to create a false appearance of legality for these acts by falsely asserting that Doreen was in arrears on fringe benefit payments (and had not paid such deficiencies) without providing notice of or an opportunity to cure such deficiencies. Pls.' Mem. in Opp'n at 47. Consistent with this theory, Doreen alleges that Local 282 formed an "association-in-fact for the purpose of using the monopoly power enjoyed by [it] to destroy" Doreen's business, drive it out of the trucking industry, and prevent it from completing contracts and subcontracts. Am. Compl. ¶ 52.

Doreen claims that the Defendants committed three different types of predicate acts (as will be discussed in further detail *infra* ): (1) Mail and Wire Fraud under 18 U.S.C. §§ 1341 and 1343, respectively; (2) Extortion as defined under the Hobbs Act, 18 U.S.C. § 1951 and New York State Law; and (3) Illegal Payments to a Union or Fund, under Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186. *Id.* ¶ 56.[10] In Doreen's

---

**10.** Allegations of wire fraud and extortion under New York Law were first introduced in Doreen's Memorandum in Opposition and have not been factually supported in any distinct manner. Moreover, neither of these claims were included in the Joint Pre–Trial Order. Therefore, the Court holds that these claims have been abandoned. *See* 6A Wright, A. Miller & M. Kane, Fed. Prac. & Proc. Civ.3d § 1527 (2003) (stating that it is up to the court's discretion whether to allow evidence beyond the scope of the pretrial order); *Wood County Airport Auth. v. Crown Airways,*

*Inc.;* 919 F.Supp. 960, 964 n. 9 (S.D.W.Va. 1996) (holding that plaintiff abandoned claim by not responding to defendant's argument for summary judgment on the issue and "most importantly" for not referencing the claim in the pretrial order); *Cf. Morales v. Turman,* 535 F.2d 864, 867 n. 7 (5th Cir. 1976), rev'd on other grounds, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977) ("The pretrial order supercedes the proceedings and becomes the governing pattern of the lawsuit.").

Memorandum in Opposition to Summary Judgment, Doreen listed the predicate acts upon which it grounds its claims.[11] The following list details the acts as they are alleged, described and supported by Doreen:[12]

1) *Spring 1994: Alleged Demand for a Bribe by Local 282 Officials*

*(Doreen claims this was extortion)*

Aldo Collusi, Anthony Conti and Peter Menechino allegedly demanded a bribe from Doreen in order to secure labor peace. Pls.' Mem. In Opp'n at 29. In other words, Doreen alleges Local 282 demanded money and threatened to strike if Doreen did not comply. The original demand was allegedly $300,000 written on a piece of paper by Collusi given to Michael Loguidice. M. Loguidice Dep., Ex. 3A to Kramer Decl.[Doc. No. 338], at 61–62, 109–110. It is undisputed that Doreen did not pay the demand. Ex. 2A to Kramer Decl. at 3; Pls.' Mem. in Opp'n at 29; M. Loguidice Dep., Ex. 3A to Kramer Decl., at 375 (noting he did not give Colussi any money). Michael Loguidice testified that he said Collusi "is crazy" and threw the piece of paper out of the window of his car. *Id.* at 370. He then told his wife, Dorothy Loguidice, to "forget about it."

11. The Defendants argue that Doreen includes among the alleged predicates some claims that Judge Platt dismissed. *See, e.g.,* Trustees' Mem. in Supp. of Mot. for Summ. J. [Doc. No. 320] at 19. Although Judge Platt dismissed many of Doreen's original claims found in the Amended Complaint, some of the factual allegations supporting those dismissed claims were specifically referenced in the remaining claims and, therefore, are still included in this action. *See, e.g.,* Count II of the Am. Compl. ¶ 50 ("Plaintiffs repeat and reallege each and every allegation contained in paragraphs '1' through '49' hereof as though fully set forth at length herein.").

That being said, in the Amended Complaint and in the Damage Statement, Doreen alleged additional actions taken by Local 282 and the Trustees as part of the scheme to put Doreen out of business. *See, e.g.,* Am. Compl. ¶¶ 67–68; Pls.' Damage Statement, Ex. 2A to Kramer Decl., at 8–14. In its memorandum in opposition to summary judgment, however, Doreen provided a detailed, chronological list of the acts it claims are the RICO predicate acts and of the evidence supporting the allegations. Pls.' Mem. in Opp'n at 29–34. This list is pared down from that in the Amended Complaint and Damage Statement. Although Doreen states that this chart sets forth "some of the predicate misconduct at issue," because it is the most recent submission and it was provided in response to a summary judgment motion, the Court considers this chart as inclusive of all of Doreen's claims of predicate acts that are of genuine issue for its case.

Importantly, Doreen has failed to point to any evidence that supports these additional allegations and the Court is "not required to engage in a hunt and peck exercise to ferret out potentially relevant" evidence. *Cf. In re Relafen Antitrust Litigation,* 286 F.Supp.2d 56, 64 (D.Mass.2003) (quoting *Pool Water Products v. Olin Corp.,* 258 F.3d 1024, 1033 (9th Cir.2001)). Moreover, at this stage—after discovery—the Defendants are entitled to a final statement of that of which they are accused and notice of the alleged supporting evidence. This failure to designate specific support in the record is fatal at the summary judgment stage. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (stating that once the movant has met its burden, the non-moving party must "go beyond the pleadings, and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, *designate specific facts* showing there is a material issue for trial") (emphasis added); *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Bldg. Indus. Fund v. Local Union No. 3, Int'l Bhd. of Elec. Workers,* 992 F.Supp. 162, 170 (E.D.N.Y.1996) (citations omitted) (stating that the party must "produce significant probative evidence tending to support [its position]"). Therefore, the Court holds that the list of alleged predicate acts found in Doreen's Memorandum in Opposition to Summary Judgment is exhaustive.

12. The headings for the acts are a paraphrase of Doreen's allegations and are not reflective of the Court's findings or rulings.

*Id.* at 63. Michael Loguidice also testified that Colussi was the only person he remembers ever attempting to bribe him. *Id.* at 109.

2) *July 1994: Alleged "Revised Demand for a Bribe" by Local 282 Officials*

*(Doreen claims this was extortion)*

Aldo Collusi, Anthony Conti and Peter Menechino allegedly "revised" their previous demand to almost $500,000 or $25 per load. Pls.' Damage Statement, Ex. 2A to Kramer Decl., at 3; Pls.' Mem. in Opp'n at 29. It is undisputed that Doreen refused to pay. Ex. 2A to Kramer Decl. at 3; Pls.' Mem. in Opp'n at 3. Doreen, however, alleges that all of the following acts stem from its refusal to succumb to these threats. *Id.;* Joint Pretrial Order, Schedule B, at 16 (Dec. 4, 2001)(claiming that Defendants harassed Doreen in an effort to put it out of business for its refusal to participate in the alleged "shakedown"). Notwithstanding this allegation, Dorothy Loguidice testified that she thought Conti was just "fishing" and that his alleged demand for money "was a joke." D. Loguidice Dep., Tab 10 to Levine Decl., at 315; D. Loguidice Dep., Ex. 3B to Kramer Decl., at 308–309 ("I considered the statement to be fishing, to see if I would go for the bait.... Dangling the bait, you know, the hot dog in front of the dog with the string.").

3) *July 1994: Alleged Overpayment Coerced by Local 282*

*(Doreen claims this was mail fraud and extortion)*

Doreen claims that Richard Kane, a Local 282 Shop Steward, entered information pertaining to "John Does" (i.e., people who did not exist) into the shop steward reports that were sent to the Funds and stamped "entered 3/22/95." Pls.' Mem. In Opp'n at 30. This, Doreen claims, resulted in payment for hours of individuals who were not Doreen's employees. Pls.' Mem. in Opp'n at 10. According to Doreen, the Defendants intentionally inflated amounts supposedly owing by using this John Doe strategy and then relying on these calculations to justify the December strike (outlined below). Pls.' Mem. in Opp'n at 38.

In support, Doreen provides testimony from Clyde Perdue (equipment superintendent) and Jack Stuart. Perdue stated that there were times when he called companies like JCS to supply trucks and drivers. He said that Richard Kane had on at least one occasion filled in John Doe names and fake information when drivers who came to the job did not provide the correct information. Perdue Testimony, Ex. 1D to Kramer Decl., at 18–21. Jack Stuart testified that there were "ghost drivers" on the shop steward reports that "indicated that the shop steward just put Doe or fictitious name." Stuart Testimony, Ex. 3C to Kramer Decl., at 650.[13] He did not testify, however, that he believed the names were fictitious or that he had personal knowledge that the names were false but merely that the documentation indicated this. There is also testimony from Stephanie Pantaliano and Lorraine McCool confirming that the John Doe information was included in the shop

---

13. Doreen also points to testimony from Dorothy Loguidice, Ex. 3C to Kramer Decl., in support of this allegation. This testimony, however, is irrelevant to whether John Doe names were actually put on the reports. Dorothy merely refers to a letter sent on December 6, 1994, stating neither the amount nor the time period for which Doreen was allegedly delinquent. Doreen indicated, however, that the time period was not for October but for September, whereas the time period of the alleged ghost driver additions is July 1994.

steward reports and that shop steward reports generally were compared with the JCS reported hours to determine discrepancies. Pantaliano Dep., Ex. 1G to Kramer Decl., at 150–51; McCool Dep., Ex. 1H to Kramer Decl., at 145–46. Neither Pantaliano nor McCool testified that they knew whether the John Doe information was included in this comparison. *Id.*

4) *December 6, 1994: Strike Notice Sent by the Defendants Based on Allegedly False and Inflated Assertions Resulting in Strike on December 13, 1994*

*(Doreen claims this was mail fraud and extortion )*

Doreen alleges that Local 282 sent a strike notice, predicated on the assertion that Doreen had failed to make proper fringe benefit contributions, without disclosing that Doreen had not been notified that monies were due or provided an opportunity to cure. Pls.' Mem. In Opp'n at 30. Moreover, the strike notice did not detail the amount that was owed. Strike Notice, Ex. 1B to Kramer Decl. (Dec. 6, 1994). Further, Doreen alleges that this strike was not called because Doreen was delinquent in Fund contribution payments, but rather to retaliate against Doreen. Pls.' Mem. in Opp'n at 37.

In support, Doreen provides testimony from (1) the Funds' Collection Coordinator stating that she was never asked, prior to the strike, whether Doreen was in arrears; and, (2) the President of Local 282, admitting that he was not sure whether the calculations of deficiencies were done before or after the strike. *Id.* Moreover, Doreen provides evidence that the actions taken by Local 282 did not conform to the Collective Bargaining Agreement, because the strike letter did not include an amount due, and because the strike occurred less than ten days after the letter was sent. *Id.* at 39–40, 42. (It is undisputed that the Collective Bargaining Agreement requires Local 282 to specify an amount due and to provide an employer ten days to cure the delinquency after notice.) Doreen argues—and supports with testimony—that the Defendants originally demanded from Doreen an "exaggerated and inflated" amount, $70,000, to end the work stoppage, Am. Compl. ¶ 47(II)(E), but then, after the strike, claimed Doreen only owed $10,000. M. Loguidice Dep., Ex. 3D to Kramer Decl., at 387–388. Finally, Doreen submits that it was forced to pay the Funds approximately $10,000. Notwithstanding these allegations, Doreen has conceded that it owed at least $10,000 in contributions at the time of the strike. Jack C. Stuart Dep., Ex. S to Bauman Decl., at 363–65 ("I believe JCS owed about $10,000 to $14,000.").

5) *January 24, 1995: Alleged Pit Bull Threat by Local 282*

*(Doreen claims this was extortion )*

Allegedly Peter Menechino, Jr., Peter Menechino, Sr., and three Local 282 agents arrived at the Brooklyn Water Tunnel Job site with a pit bull. Pls.' Mem. In Opp'n at 31. Subsequently, they threw Rodney Warwick off the job and stated that "[a]ny Local 813 man or non-union man would have to meet my lion." *Id.* Then the men released the pit bull, which attacked and bit one of the men. *Id.* This, Doreen claims, slowed down work and instilled injury, pain and suffering, and fear and intimidation in its workers. Pls.' Damage Statement, Ex. 2A to Kramer Decl., at 8–10; Pls.' Mem. in Opp'n at 31.

In support, Doreen points to testimony by Dorothy Loguidice, who stated

that "[t]he whole thing was about Rodney's Teamsters 813 book. At this point, Rodney was not [Doreen's] employee, he was employed by someone else, but it happened on [Doreen's] job." D. Loguidice Dep., Ex. 3E to Kramer Decl., at 400.[14]

6) *February 23, 1995: Alleged Slowdown and Work Stoppage by Local 282*

(*Doreen claims this was extortion*)

Doreen alleges that on February 23, 1995, Peter Menechino, Jr. caused a slowdown of Doreen's work and when Jack Stuart objected, Menechino, Jr. ordered trucks to stop loading and said "[n]ot a peep out of your mouth about Local 282 or Kelly, or I will drag you out into the street and kick the shit out of you." Pls.' Mem. in Opp'n at 31. Later, according to Doreen, Menechino, Sr. arrived and blocked the exit to the job. After that, George Finch and Lawrence Kudla allegedly arrived and threatened "[w]ho wants to fight? I want a good fight." *Id.*

Doreen alleges that this was part of Defendants' retaliation for Doreen's refusal to pay bribes. In support, it provides testimony that suggests that this act involved a power struggle. *See, e.g.,* D. Loguidice Dep., Ex. 3F to Kramer Decl., at 325–328 (characterizing the fight as "some sort of power struggle to see who was boss" because Doreen's employees were directed not to get out of the truck but to wait for the laborer to provide the dump ticket while the shop stewards wanted the driver to get out of the truck and walk to find the laborer to get the dump ticket him or herself). There is also evidence, however-

er, suggesting that the slowdown or work stoppage was due to Local 282's belief that money was owed the funds. *See, e.g.,* D. Loguidice Dep., Ex. 3F to Kramer Decl., at 295 (explaining that she was present during the confrontations that occurred and "when they were yelling at them that he owed the fund a lot of money").

7) *August 15, 1995: Alleged Threats and Intimidation to Create Fraudulent Records by Local 282*

(*Doreen claims this was mail fraud and extortion*)

Allegedly, Local 282 employees required drivers to sign in multiple times, resulting in a fraudulent record that indicated drivers worked multiple 8–hour shifts. Pls.' Mem. In Opp'n at 32.

8) *August 28, 1995: Alleged Threats and Intimidation to Create Fraudulent Records by Local 282*

(*Doreen claims this was mail fraud and extortion*)

On August 28, 1995, Local 282 employees allegedly required drivers to sign phony entries in the shop steward report to result in a fraudulent amount of increased shifts. *Id.*

.9–15) *July 1996—April 1997: Alleged Wire and Mail Fraud*

It is undisputed that between July 1996 and April 1997, Local 282 and the Trustees sent out various letters and made various phone calls to contractors informing them that Doreen was in arrears and that the contractors may be held responsible. It is also undisputed that these letters were sent without prior notice to Doreen and without providing Doreen an opportunity to cure as

---

**14.** Doreen indicated in its Memorandum in Opposition that Rodney Warwick's Statement also supported these allegations but included

it in the Kramer Declaration supplied to the Court as specified.

required under the Collective Bargaining Agreement. Doreen alleges that these letters and phone calls resulted in loss of work. *Id.* at 32–34. Moreover, it alleges that these letters contained false allegations.

16) *The ERISA Collection Action*

Although the ERISA collection action is not listed in the chart detailing the alleged predicates, Doreen repeatedly asserts in its Complaint and Memorandum in Opposition to Summary Judgment that the Trustees commenced a fraudulent lawsuit to recover contributions that were not owing. Am. Compl. ¶ 47(II)(c); Pls.' Mem. in Opp'n at 14, 40. Doreen claims that it was singled out and placed under greater scrutiny than other employers. *Id.* Further, it alleges that the action was brought without following the litigation procedures set out in the Collective Bargaining Agreement, such as conducting an audit and providing a written report. *Id.* at 39–40. Lastly, it claims that the revised estimate of damages in the action was for one third the original estimate and that this shows that the action was commenced to punish Doreen for its refusal to capitulate to the Defendants' demands for kickbacks. Am. Compl. ¶ 47(II)(c).

Doreen argues that the above acts constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(1)(5). Am. Compl. ¶ 57.[15]

## C. Local 282 and the Trustees' Motions For Summary Judgment [16]

Local 282 and the Trustees move for summary judgment because they allege that Doreen cannot establish facts that would meet the legal elements of RICO. Local 282's Mem. in Supp. at 17; Trustees' Mem. in Supp. of Mot. for Summ. J. [Doc. No. 320] ("Trustees' Mem. in Supp.") at 20. Specifically, Local 282 claims that Doreen has failed to demonstrate (1) the requisite two predicate acts; (2) a pattern of racketeering activity; and (3) injury by reason of RICO violation. Trustees' Mem. in Supp. at 22, 41, 42; Local 282's Mem. in Supp. at 19, 29, 34. They assert that the undisputed facts now show that (1) Doreen was not an innocent, contract-abiding employer; and (2) that Local 282 and the Trustees engaged in lawful and appropriate enforcement efforts in response to Doreen's consistent underpayment of wages and fringe benefits. Local 282's Mem. in Supp. at 2. As part of their basis for asserting that Doreen has failed to demonstrate the two predicate acts necessary, the Defendants rely on the doctrine of collateral estoppel as it relates to the arbitrator's decision. As reviewed in the Procedural Background section, since the motions for summary judgment were made, this Court has conducted a trial in a related action, the ERISA Collection Action. Because the argument is essentially the same, the Court will also address whether any necessary findings or rulings or the parties' admissions from the ERISA Collection Action collaterally estop Doreen from making any of its current claims. *See Broderick Wood Prods. Co. v. United States,* 195 F.2d 433, 436 (10th Cir.1952) ("[I]f the case is one appropriate for the entry of summary judgment, the fact that it may be granted on a ground different

---

**15.** Doreen also argues that its RICO claims are demonstrated by the fact that it was treated disparately as compared with other employers. Pls.' Mem. in Opp'n at 15–16.

**16.** Although the two defendants moved separately, the substance of their motions is almost identical. Therefore, the Court will address both motions simultaneously but will point out any arguments or issues specific to either defendant where relevant.

from that specified in the motion therefor does not warrant the disturbing of the judgment on appeal."); *Board of Natl. Missions of Presbyterian Church in the United States v. Smith,* 182 F.2d 362, 364–65 (7th Cir.1950) ("The fact that judgment was granted on a reason different from that assigned by the defendant in his summary judgment motion is immaterial, where, as here, the motion was properly granted on the undisputed facts shown and on an issue presented by plaintiff's complaint."); *Time Inc. v. Bernard Geis Assocs.,* 293 F.Supp. 130, 133 (S.D.N.Y.1968) (granting summary judgment despite the fact that no motion was made and reasoning that "[i]f defendants are entitled to summary judgment, it may properly be granted by the Court even without a written or formal motion"); *but see John Deere Co. v. Am. Nat'l Bank,* 809 F.2d 1190, 1191 (5th Cir.1987) (holding that summary judgment on grounds not urged by movant and without adequate notice to non-movant was improper).

## III. DISCUSSION

### A. Legal Standard

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, no genuine issues of material fact remain. Fed. R.Civ.P. 56(c); *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Id.* at 255, 106 S.Ct. 2505. In making its determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.* The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the non-movant's case or by showing the absence of any material fact. The movant is not required to make an affirma-

tive showing that there are no material facts in issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Instead, the movant only has to show an "absence of evidence to support the non-moving party's case." *Id.* Once the movant has met its burden, the non-moving party must "go beyond the pleadings, and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a material issue for trial.'" *Id.* at 323–324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *Scotto,* 143 F.3d at 114; *United States v. Pent–R–Books, Inc.,* 538 F.2d 519, 529 (2d Cir.1976) (stating that the non-moving party must "produce 'significant probative evidence' tending to support it [sic] position'" (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968))). Summary judgment shall be granted "only if no reasonable trier of fact could find in favor of the nonmoving party." *Sutera,* 73 F.3d at 16 (citations omitted); *Matsushita Elec. Indus., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotations and citations omitted); *Taggart v. Time,* 924 F.2d 43, 46 (2d Cir.1991) (same).

### B. Are Any of Doreen's Claims Precluded?

As alluded to above, prior decisions relevant to this case along with Doreen's own admissions preclude Doreen from now asserting some of its claims.

#### 1. Collateral Estoppel Effect of Prior Proceedings

#### a. The ERISA Collection Action

 The doctrine of collateral estoppel precludes relitigation of an issue of law

or fact that was decided in a prior proceeding. *Boguslavsky v. Kaplan*, 159 F.3d 715, 719–720 (2d Cir.1998). Collateral estoppel applies when four factors are met:

> (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Id.* at 720 (quotations and citations omitted).

■ In the admittedly related ERISA Collection Action,[17] this Court found Doreen liable to the Trustees for underpayment of fund contributions to the pension plans under the governing Collective Bargaining Agreements for the period between 1993 and 1996, notwithstanding that the agreement was not signed and that the Trustees failed strictly to follow the Collective Bargaining Agreement's demand requirements. Trial Tr. Vol. 5 at 556:11–17, 559:1–15. This factual finding meets the elements noted above and, therefore, cannot be relitigated by Doreen now. That it was actually litigated and decided is clear from the fact that the Court held that Doreen owed contributions to the Funds for the time period in which the letters were sent and the phone calls were made. The parties had a full and fair opportunity to litigate the issue. This Court conducted a bench trial from May 12 through May 16, 2003. Both sides had equal amounts of time to present evidence and make arguments. This issue—whether Doreen actually owed funds to the Trustees—was the central issue of the case. Doreen was afforded the opportunity to provide defenses to the allegations and so presented them to the Court. The Court found none of these arguments persuasive. Moreover, this issue was "necessary to support a valid and final judgment on the merits," as it was an ERISA collection action for delinquent funds. The central issue was whether or not Doreen owed fund contributions, and the Court found that it did.

■ Therefore, the fact that Doreen owed fund contributions to the Trustees for the period between 1993 and 1996 cannot be relitigated now even if the cause of action in the subsequent proceeding is different. *Benjamin v. Traffic Executive Ass'n Eastern Railroads*, 869 F.2d 107, 111 (2d Cir.1989) ("Under collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." (quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466–67 n. 6, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982))); *Boguslavsky*, 159 F.3d at 719–720.[18] Accordingly, any of Doreen's RICO claims that are negated by this factual finding cannot be litigated now. *Cf. Benjamin*, 869 F.2d at 114 (granting collateral estoppel effect to an arbitrator's factual finding on an issue which undergirded the plaintiff's RICO claims).[19]

---

17. As mentioned earlier, Doreen moved for joint trial of this case and the ERISA Collection Action. For various reasons, the Court declined to allow this motion. It is undisputed, however, that many of the facts underlying the claims in both cases overlap.

18. Arguments that the Union exaggerated the actual amount it claimed was owing, however, are not collaterally estopped.

19. As a defense against the ERISA Collection Action, Doreen claimed that the Trustees failed to follow strict notice requirements and, therefore, that it should be relieved of its obligations under the Collective Bargaining Agreement. The Court ruled, however, that Doreen waived the written demand requirement found in the Collective Bargaining Agreement "by [its] conduct in urging the

### b. The Confirmed Arbitration Decision

■ Collateral estoppel is also applicable to factual findings made in arbitration proceedings. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (acknowledging that courts may give preclusive effect to arbitration proceedings to protect federal interests); *Boguslavsky*, 159 F.3d at 720; *Benjamin*, 869 F.2d at 112 (noting that collateral estoppel is more appropriate than claim preclusion in the arbitration context). In a counterclaim in this case, a neutral arbitrator found Doreen liable for underpayment of wages to drivers in accordance with the 1993–1996 and 1996–1999 Collective Bargaining Agreements. Arbitration Opinion and Award, Tab 1 to Levine Decl., at 2, 15. This Court confirmed that decision, holding it to be "fundamentally fair." *Doreen*, 250 F.Supp.2d at 115–16. The decisions made by the arbitrator were within his purview, and the parties were provided ample opportunity to present evidence and defenses. *Id.*[20] Therefore, as in *Benjamin*, "[t]he policies behind collateral estoppel counsel for its use in this instance," even though the fact-finding process is different in arbitration. *Benjamin*, 869 F.2d at 110, 112 (noting that the purpose of collateral estoppel is to protect "adversaries from the expense and vexation attending multiple lawsuits, conserve[ ] judicial resources, and foster[ ] reliance on judicial action by minimizing the possibility of inconsistent decisions" (quoting *Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979))). The parties were given a full and fair opportunity to litigate the issue. The issue was the central one for arbitration and, therefore, was necessary to the arbitrator's decision. Moreover, as held in *Doreen*, 250 F.Supp.2d at 113, it was a final judgment on the merits, notwithstanding that damages were not awarded.

Thus, the fact that Doreen owed wages to Local 282 drivers cannot be relitigated. Accordingly, any claims that are negated by such a fact naturally fail. *Benjamin*, 869 F.2d at 110 (granting collateral estoppel effect to arbitration panel's factual findings that underlie acts upon which the RICO claim was based). In other words, Doreen cannot pursue any RICO claims that rely on a fact inconsistent with the

---

joint review of [its] records in the course of these proceedings, the conduct that led up to the KPMG report" and that the "statutory requirements of such payments into pension funds by ERISA cannot be frustrated by the Trustees' failure strictly to follow the requirements of the Collective Bargaining Agreement." *King v. JCS Enterprises, Inc.*, Trial Tr. Vol. 5 at 559:1–15. This ruling—that allegations of breach of contract notice provisions are waived—is also one that cannot be relitigated in the current case. Doreen was provided—and took advantage of—a full opportunity to present this defense during the Bench trial. It claimed, *inter alia*, that the failure to follow those policies and procedures was done in order "break" Doreen. *Id.* at 534. The Court decided based on the merits that Doreen had waived this defense. Moreover, this decision was necessary to the judgment. Had the Court not found waiver of the notice provisions, it could not have found Doreen liable to the Trustees.

**20.** Doreen argues strenuously that the arbitrator's factual findings should not be given preclusive effect because it was not provided the opportunity to present its defenses to arbitration. Pls.' Mem. in Opp'n at 5–22. As explained in *Doreen*, "the defenses to which Doreen alluded during the summary judgment hearing before this Court *were* presented, heard, and decided against Doreen by both Judge Platt and Arbitrator Adelman." *Doreen*, 250 F.Supp.2d at 113. Moreover, Doreen is being provided another opportunity to present these defenses at the damages phase in order to limit Local 282's recovery. *Id.* Therefore, these arguments are not persuasive.

arbitrator's finding that Doreen owed wages during these time periods.

## 2. What Claims Are Precluded?

### a. Mail and Wire Fraud

▆▆▆ Collateral estoppel prevents Doreen from now pressing its mail and wire fraud claims. Although the actual claims in the RICO case are not identical to those made in the ERISA Collection Action, underlying each of Doreen's allegations of mail and wire fraud is the contention that the Defendants intentionally or recklessly defrauded it because Doreen did not owe benefit contributions when the letters were sent. Thus, Doreen seeks to relitigate a factual issue decided by this Court—which it cannot do. *Cf. Benjamin,* 869 F.2d at 114. To prove mail fraud under 18 U.S.C. § 1341, or wire fraud under 18 U.S.C. § 1343, Doreen would have to show, *inter alia,* that Local 282 and the Trustees used mail or wire for the purpose of executing a scheme to defraud or obtain money by means of false pretenses or promises; and it would have to show a specific intent to defraud either by devising, participating in, or abetting the scheme. 18 U.S.C. § 1341; 18 U.S.C. § 1343. *See S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir.1996); *O'Malley v. New York City Transit Auth.,* 896 F.2d 704, 706 (2d Cir.1990) (addressing mail fraud only and stating that "intentional fraud or 'reckless indifference to the truth'" is a necessary component (internal citations omitted)); *Morrow v. Black,* 742 F.Supp. 1199, 1205 (E.D.N.Y.1990) (noting that pleading requirements for wire fraud are almost identical except that the defendants must have used interstate wire to effect the scheme). Doreen does not allege that the Defendants claimed more money than was actually owing, rather Doreen asserts that it did not specify the amount due as required under the Collective Bargaining Agreement.[21] Therefore, given the prior rulings of this Court that Doreen owed benefit fund contributions during the time period when each of the notices were allegedly sent and phone calls allegedly made, Doreen cannot meet its burden.[22] Moreover, Doreen cannot claim

**21.** For that matter, Doreen does not allege that any of the phone calls or letters constituted extortion.

**22.** The Defendants correctly contend that the wire fraud claims fail irrespective of this Court's prior findings. The federal wire fraud statute, 18 U.S.C. § 1343, prohibits the transmission "by means of wire, radio or television communication in *interstate* or foreign commerce [of] any writings ... or sounds" in furtherance of "any scheme or artifice to defraud." 18 U.S.C. § 1343 (emphasis added). As such, this section does not cover telephone calls that are purely intrastate. *DiFiore v. DiLorenzo,* No. 91–4209, 1997 WL 722697 at *4 (E.D.N.Y. Sept.19, 1997); *United States v. Paredes,* 950 F.Supp. 584, 587 n. 3 (S.D.N.Y.1996). Here, the Amended Complaint and the current record does not support the contention—and Doreen does not even allege—that *interstate* telephone calls were made. *Cf. Chazin v. Lieberman,* No. 89–5968, 1990 WL 115716, at *3 (S.D.N.Y. Aug.6, 1990) (noting that "there are no factual allegations in the complaint from which to draw the conclusion that interstate wire or electronic communications were made" and holding that the "complaint [did] not allege factual allegations sufficient to show any interstate wire transmission") On the contrary, the only inference to be drawn from the current record is that all of the actions took place in New York, because all of the plaintiffs "are members of the construction industry in the New York area," Pls.' Mem. in Opp'n at 1; Am. Compl. ¶¶ 5–16, and the business was conducted at construction sites in New York City. *Id.* ¶ 54; see also letters addressed to Asplundh Construction Corporation and Cipico, Tabs 35 and 36 to Levine Decl. (indicating these two companies—to which phone calls were allegedly made—are located in New York). Moreover, in its Amended Complaint, Doreen does not even allege wire fraud but only mail fraud; and in its Memorandum in Opposition to

that efforts by Local 282 or the Trustees to collect delinquent funds lack a reasonable or good faith basis, given this Court's finding that Doreen was delinquent at the time the letters were sent. *United States v. Alkins*, 925 F.2d 541, 550 (2d Cir.1991) (stating no intent to defraud if individual believes that information in mailing is true); *Crown Heights Jewish Community Council, Inc. v. Fischer*, 63 F.Supp.2d 231, 238 (E.D.N.Y.1999).[23]

Finally, these claims fail because Doreen admitted during the ERISA Collection Action trial that a finding by this Court that Doreen was delinquent in fringe benefit contributions would negate all allegations of mail fraud in this RICO case.

> The Court:
>
> [W]hatever the merits of [the RICO lawsuit] it has no bearing, does it, on the resolution of this one, which is the dispute between the trust funds and the, the [sic] corporations and individuals you represent. This one can be resolved without regard to the resolution of the other one. Isn't that true?
>
> Mr. Barbiero (Doreen's Counsel):
>
> Your Honor, at the risk of weakening our position in the RICO case I cannot agree with you, sir.... if you find in this case that [Doreen] is in violation of her fringe benefit contributions, well sir, then there's no mail fraud.

Trial Tr. Vol. 5 at 534:20–24, 535:2–12. Thus, Doreen agreed that, given the finding of the Court in the ERISA Collection Action, its allegations of mail fraud must fail.[24] In so agreeing, Doreen also implicitly disclaimed its allegations of wire fraud because those claims are based on the exact same allegations, facts, and theories

Summary Judgment, Doreen does not even attempt to explain how actions by the Defendants meet the requirements of wire fraud pursuant to 18 U.S.C. § 1343. Given that any claims of fraud, including RICO claims based on mail and wire fraud, must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure, *Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F.Supp. 213, 228 (S.D.N.Y.1992); *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990), Doreen's claims of wire fraud fail.

23. As part of the general support for its RICO claims and specific evidence of mail fraud, Doreen also alleges that Local 282 and the Trustees breached contract requirements such as strict notice provisions and failed to inform the recipients of the delinquency notices that Doreen had not been given an opportunity to cure. These allegations are precluded because the Court already found these requirements to be waived. *See* discussion *supra*.

Even if these claims were not precluded, they do not revitalize Doreen's claims of mail fraud because they do not evince an intent to commit mail fraud. *See, e.g., Blount Financial Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152 (6th Cir.1987), especially when considered in light of the Court's prior ruling that Doreen owed benefit funds, and the pleading requirements for fraud pursuant to Fed. Rule Civ. P. 9(b). Such speculation as to intent creates at most a speck of doubt, which is legally insufficient to create an issue of fact in the mind of a reasonable fact-finder. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (footnote omitted). Doreen must produce "hard[er] evidence" than this at the summary judgment phase. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998). Moreover, these contract violation allegations, even if true, do not amount to a RICO predicate act. "Congress did not deploy RICO as an instrument against all unlawful acts ... [but] targeted only predicate acts catalogued under section 1961(1)." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir.1990); 18 U.S.C. § 1961(1).

24. This admission also negates its allegations that Doreen was treated disparately as compared with other employers and that this alleged disparate treatment evidences RICO scienter. Pls.' Mem. in Opp'n at 15.

as the mail fraud. *See Morrow*, 742 F.Supp. at 1205.

For the foregoing reasons, this Court holds that Doreen is now precluded from making its original mail and wire fraud claims. Thus, predicate acts numbered 9, 10, 11, 12, 13, 14, and 15 above are no longer a part of this case. Additionally, the mail fraud allegations of predicate acts 3, 4, 7, and 8 are also no longer a part of this case.

### b. Alleged Illegal Payments to a Fund in Violation of 29 U.S.C. Section 186

 Along with the allegations of mail and wire fraud, Doreen's allegations of illegal payments to a Union or Fund in violation of section 302 of the LMRA, 29 U.S.C. § 186, are also precluded. In the Amended Complaint, these allegations were directed to "the false demands for contributions and resulting payment" by Doreen. Am. Compl. ¶ 56(III)(A). As discussed above, the Court found in the ERISA Collection Action that Doreen was delinquent in fund contributions and Doreen has not claimed with reference to this allegation that the demands were inflated. Thus, Doreen cannot now claim that the Trustees' demands were false, for that would result in relitigating what the Court has already decided as part of a final judgment on the merits: Doreen was delinquent in fund contributions. To allow Doreen to proceed with this claim could result in an inconsistent finding. Therefore, Doreen is estopped from making this claim.

Moreover, Doreen concedes, in the Amended Complaint, that the Funds are qualified employee benefit plans under ERISA and that the monies received from Doreen were invested in the Funds. Am.

Compl. ¶ 28. At no point has Doreen alleged that the Funds were established for any reason other than the "sole and exclusive benefit of the employees" and "for the purpose of paying ... for the benefit of employees." 29 U.S.C. § 186(c)(5). At most, Doreen alleges that the contributions to the Funds were diverted and converted for the Defendants' own use.[25] Am. Compl. ¶ 53. According to the Supreme Court, however, such alleged failure to comply with the purposes of the Funds is "irrelevant." *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581, 589 n. 3, 113 S.Ct. 2252, 124 L.Ed.2d 522 (1993).

> [T]he exception to violation set forth in paragraph (c)(5) relates not to the purpose for which the trust fund is in fact used ... but rather to the purpose for which the trust fund is "established," ... and for which the payments are "held in trust" .... The Trustees' failure to comply with these latter purposes may be a breach of their contractual or fiduciary obligations ... but it is no violation of § 302.

*Id.* at 588–89, 113 S.Ct. 2252; *Arroyo v. United States*, 359 U.S. 419, 423–24, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959); *see also DeVito v. Hempstead China Shop Inc.*, 38 F.3d 651, 653–54 n. 3 (2d Cir.1994) (holding that *Demisay* precludes the argument that payment would have been in violation of section 302(c)(5) of the Labor Management Relations Act because defendant "[did] not contest that the Benefit Fund was properly established under § 302(c)(5)" but only contended that "it was subsequently operated in a manner inconsistent with § 302(c)(5)"). Accordingly, any existing allegations of a 29 U.S.C. § 186 violation alternatively fail for these reasons.

Lastly, Doreen, in its Memorandum in Opposition, failed to object to Defendants'

---

**25.** It does not appear that these allegations have been supported with any evidence.

arguments that summary judgment should be granted with respect to allegations of a 29 U.S.C. § 186 violation. In fact, in describing the predicate acts, plaintiffs allege only extortion, in violation of New York Law and the Hobbs Act, 18 U.S.C. § 1951, and mail fraud, in violation of 18 U.S.C. § 1341. Pls.' Mem. in Opp'n at 22. At this stage, Doreen's failure to "go beyond the pleadings, and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, *designate* specific facts showing there is a genuine issue for trial" is fatal. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (emphasis added and internal quotations omitted).

### c. Propriety of the ERISA Collection Action

■■■ The Court's rulings in the ERISA Collection Action also necessarily negate any arguments that it was brought as part of a RICO conspiracy to retaliate against Doreen or put Doreen out of business. The Trustees' claims of underpayment have been shown to be meritorious and, therefore, the ERISA Collection Action cannot be included among the predicate acts upon which Doreen's RICO claim is based because it would require relitigation of the factual issue regarding delinquent fund contributions. To prove extortion under the Hobbs Act or New York Law, Doreen would have to show "wrongful means and wrongful objective." *Viacom Int'l Inc. v. Icahn,* 747 F.Supp. 205, 210 (S.D.N.Y.1990) (discussing the Hobbs Act); *United States v. Enmons,* 410 U.S. 396, 419 n. 16, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973) ("[E]xtortion requires an intent 'to obtain that which in justice and equity the party is not entitled to receive.'" (quoting *People v. Cuddihy,* 151 Misc. 318, 271

N.Y.S. 450, 456 (1934), and referring to New York State Law)). Here, the objective—to collect delinquent fund contributions—is not only a rightful one but a duty. *See Cent. States v. Cent. Transp., Inc.,* 472 U.S. 559, 572–73, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985); *Liss v. Smith,* 991 F.Supp. 278, 290–91 (S.D.N.Y.1998) (holding that a fiduciary's failure adequately to seek to collect delinquent contributions known to be owing to the funds is a breach of the trustee's fiduciary duty.) Moreover, the filing of such a lawsuit—even if it were meritless and for the purpose of harassment—would not as matter of law constitute extortion under New York or federal extortion law because it does not involve threat of force, violence, or fear, as required under both the N.Y. Penal Law § 155.05(2)(e) and the Hobbs Act, 18 U.S.C. § 1951. *Bldg. Indus. Fund,* 992 F.Supp. at 176 n. 9 ("The filing of a meritless lawsuit or administrative action, even if for the purpose of harassment, does not involve threat of force, violence or fear."); *Park South Assoc. v. Fischbein,* 626 F.Supp. 1108, 1112 (S.D.N.Y.1986) (dismissing RICO action based on plaintiff's allegations that defendant's allegedly meritless lawsuit constituted extortion under state law and the Hobbs Act).[26]

In sum, the Trustees' ERISA Collection Action was not an attempt "to obtain property 'to which [they had] no lawful claim'" and therefore, the Trustees did not commit extortion. *Viacom,* 747 F.Supp. at 210 (quoting *Enmons,* 410 U.S. at 400, 93 S.Ct. 1007).

### d. Allegations of Improper Strike Notice and Strike (Mail Fraud & Extortion)

To the extent that this allegation includes one for mail fraud and contract

---

**26.** Thus, any argument that the ERISA Collection Action was improper and constituted extortion based on the fact that the original damage request was two-thirds higher than the revised damage request fails as well.

violations, it fails for the same reasons as noted above in section III(B)(1)(a). Moreover, claims of extortion are also precluded. First, as discussed, this Court found that Doreen owed benefit contributions at the time that the strike notice was sent and the strike occurred. Additionally, a neutral arbitrator found that Doreen owed wages to drivers during this same time period. Arbitration Opinion and Award, Tab 1 to Levine Decl., at 2, 15. As such, Doreen cannot now claim that strike notices or the December 1994 strike by Local 282 to collect delinquent payments lacked a reasonable or good faith basis. *Cf. Benjamin*, 869 F.2d 107, 110 (2d Cir.1989) (granting collateral estoppel effect to arbitration panel's factual finding regarding the underlying acts upon which the RICO claim was based). To prevail on its extortion claims, Doreen would have to show, *inter alia,* that the strike equated to threatened force that was wrongful. 18 U.S.C. § 1951(b)(2); *Viacom Int'l Inc. v. Icahn,* 747 F.Supp. 205, 210 (S.D.N.Y.1990) ("There are two elements to a Hobbs Act violation: wrongful means and wrongful objective."). This is impossible given the prior findings discussed above.

Moreover, the Supreme Court has held that "the Hobbs Act does not apply to the use of force to achieve legitimate labor ends." *United States v. Enmons,* 410 U.S. 396, 400–01, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). Here, it is undisputed that (1) Local 282 had the contractual right to strike against employers who were delinquent in fund contributions; (2) Local 282 had the contractual right to send out strike notices; (3) Local 282 sent out notices stating that Doreen was delinquent; and (4) Doreen, was, in fact delinquent at the time of the strike. Doreen's arguments that the actions taken by Local 282 did not conform to the Collective Bargaining Agreement because the letter did not include an amount and the strike occurred less than ten days after the letter was sent do not bring the use of force in the form of a strike back into the purview of the Hobbs Act. Along with the Supreme Court, Congress has made clear that strike violence is not encompassed by the Act. *Enmons,* 410 U.S. at 404–05, 93 S.Ct. 1007 (explaining that Congressman Hobbs himself stated that "the bill does not cover strikes or any question relating to strikes").

For that matter, strike violence is also not covered by New York's Extortion Statute. In *Enmons,* the Supreme Court explained that under the New York Statute, in order to convict an accused of extortion, evidence must show that the person was "actuated by the purpose of obtaining a financial benefit for himself ... and was not attempting in good faith to advance the cause of unionism ...." *Enmons,* 410 U.S. at 406 n. 16, 93 S.Ct. 1007 (quoting *People v. Adelstein,* 9 A.D.2d 907, 195 N.Y.S.2d 27, 28 (1959)). Given that a neutral arbitrator found that Doreen owed wages to the drivers—a finding confirmed by this Court—and that this Court held that Doreen owed benefit fund contributions, Doreen simply cannot show the requisite lack of good faith.

The legitimacy of the notice and strike is further supported by Doreen's admission that it was delinquent in fund contributions at the time of the strike. As detailed in the factual background, Jack Stuart stated in his deposition that he "believe[d] JCS owed about $10,000 to $14,000" at the time of the strike. Stuart Dep., Ex. S to Bauman Decl., at 364:23–24.

Lastly, not only is Doreen is precluded from proving a fact necessary to demonstrate extortion but Doreen is precluded from relitigating whether the 1994 strike and strike notice was extortion resulting in overpayment. In the ERISA Collection

Action, Doreen made these very same allegations. Counsel in closing arguments explained very clearly that "the issues in this case are whether there has been an underpayment of fringe benefit contributions or whether as we claim there's been an overpayment because of an illegal strike that extorted $10,000." Trial Tr. Vol. 5 at 529 (5/16/03); *see also* Trial Tr. Vol. 3 at 347–59 (5/14/03)(presenting evidence of illegal strike and failure to follow contract provisions); Trial Tr. Vol. 4 at 514–15 (5/15/03)(same). The Court, in deciding for the Defendants, necessarily decided against Doreen and its allegations that the strike was illegal or that overpayments had been made. If this were not the case, the Court would have, at the least, ordered—as it did with the Bull Dog billings—that a reduction to the total amount due should be made.

■■■ Doreen argues strenuously that the $70,000 demand was extortionate in that it was knowingly inflated and exaggerated and that the strike was predicated on this demand. While this Court has already found implicitly that the strike was proper because, as Doreen admits, at least $10,000 was then due and owing, Doreen is not precluded by this finding from pressing its claim that the $70,000 demand was extortionate (although it is hard to see how such a demand and threat of a strike constitutes a threat of force or violence (*see infra*) or how the resultant justifiable strike (promptly settled upon payment of the amount due and owing) caused Doreen any damage beyond the justifiable economic harm).

## C. Could a Reasonable Trier of Fact Find in Favor of Doreen Based on its Remaining Claims?

The predicate acts that remain a part of Doreen's RICO action and that are subject to the Defendants' summary judgment mo-

tions are Predicate Acts numbered 1, 2, 3 (extortion allegations only), 5, 6, 7 (extortion allegations only), and 8 (extortion allegations only), which Doreen claims represent a scheme of threats and extortion to retaliate against and destroy Doreen for refusing to pay bribes. Pls.' Mem. in Opp'n at 50.

■■■ To prevail in a RICO action under Section 1962(c), the plaintiff must prove seven elements:

> (1) that the defendant (2) through the commission of two or more acts (3) constituting a pattern (4) of "racketeering activity" (5) directly or indirectly ... participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d. Cir.1983) (citing 18 U.S.C. § 1962(a)-(c)); *FD Property Holding, Inc. v. U.S. Traffic Corp.*, 206 F.Supp.2d 362, 369 (E.D.N.Y.2002). The two acts must be federal or state law crimes and must have occurred within 10 years of each other. *Econ. Opportunity Commn. of Nassau County v. County of Nassau, Inc.*, 47 F.Supp.2d 353, 362–63 (E.D.N.Y.1999). To succeed in a RICO action, the plaintiff must establish a pattern of racketeering activity. 18 U.S.C. § 1961(5); *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 154, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ("[T]he heart of any RICO complaint is the allegation of a *pattern* of racketeering.") (emphasis in original). To do so, a plaintiff must demonstrate that (1) the two predicate acts are related and (2) they amount to or pose a threat of continuing criminal activity. *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 97 (2d Cir.1997); *United States v. Indelicato*, 865 F.2d 1370, 1381 (2d Cir.1989).

### 1. The Trustees' Motion for Summary Judgment

▮▮▮▮▮ In addition to demonstrating what is noted above, to prevail in a RICO action under Section 1962(c), the plaintiff must show that *each* defendant conducted or participated directly or indirectly in the conduct of a RICO enterprise by committing at least two acts of racketeering in furtherance of the illegal enterprise. 18 U.S.C. § 1961(5); *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992) ("[T]he bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts."); *Tarr v. Credit Suisse Asset Management, Inc.*, 958 F.Supp. 785, 802 n. 14 (E.D.N.Y.1997). The only remaining predicate act that Doreen alleges was conducted by someone associated directly with the Trustees or the Funds is predicate act # 6. Pls.' Mem. in Opp'n at 31 (citing Lawrence Kudla as one of the actors directly responsible). Because Doreen only alleges one predicate act against the Trustees, Doreen's claim of a RICO violation against the Trustees fails.

Furthermore, Doreen fails to submit any evidence that the Trustees "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" by "participat[ing] in the operation or management of [a RICO] enterprise." *Reves v. Ernst & Young*, 507 U.S. 170, 177, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (quoting 18 U.S.C. § 1962(c)); 18 U.S.C. § 1962(c); *De Falco v. Bernas*, 244 F.3d 286, 309–312 (2d Cir.2001); *United States v. Allen*, 155 F.3d 35, 40–43 (2d Cir.1998); *Blue Cross and Blue Shield of New Jersey, Inc., v. Philip Morris Inc.*, 113 F.Supp.2d 345, 366 (E.D.N.Y.2000). Doreen does not even allege that the evidence "will show" such association or conduct by the Trustees—it only does so as it relates to Local 282. In its Memorandum in Opposition to Summary Judgment, Doreen merely alleges that "*Local 282,* acting through the individuals identified in the chart ... directed the predicate misconduct." Pls.' Mem. in Opp'n at 59 (emphasis added). Lawrence Kudla is the only trustee mentioned in the chart and he is only mentioned in relation to one predicate act. Furthermore, in discussing how the predicate activity was conducted through the alleged enterprise, the only involvement by the Funds that is even alleged generally concerns the allegations of mail fraud—which, as noted above, Doreen is now precluded from pursuing. Pls.' Mem. in Opp'n at 47–48 (arguing that Local 282 used its relationship with the Funds and Trustees to "create a false appearance of legality by asserting Plaintiffs were in arrears in the payment of fringe benefits due to the Funds (and had not paid such deficiencies)"); *see also id.* at 50–51 (asserting that "the scheme was to spread lies backed up by the Trust Funds' paperwork, throughout the industry, that Plaintiffs were not properly paying fringe benefit contributions and would not cure such deficiencies").

Finally, there is no evidence in the record suggesting that Kudla was understood to be acting as a representative of the Trustees or Funds. The mere fact that Kudla, in addition to being a trustee, was also Local 282's business agent, "does not mean that [their] activities can automatically be attributed" to the Funds. *Bldg. Indus. Fund*, 992 F.Supp. at 177 (granting summary judgment because the only evidence that [a fund] had anything to do with the threats or acts of violence directed toward plaintiffs was the fact that some of the members of the Union were also employee representatives of [the fund]). While Doreen has raised genuine issues of

material fact as to whether Local 282 deliberately engaged in a campaign of harassment and retaliation against it, the Court finds no reasonable trier of fact could conclude based on this record that the Trustees acted as principals in this incident [Predicate # 6] simply because Kudla was a trustee of the Funds. *Id.* at 177.

Ultimately, because the Trustees can only be liable for a RICO violation if they engaged in two predicate acts, there is no material issue of fact which precludes summary judgment for the Trustees. Accordingly, this Court grants the Trustees' Motion for Summary Judgment. Therefore, the remaining analysis pertains only to Local 282's motion for summary judgment against Doreen.

### 2. Local 282's Motion for Summary Judgment

#### a. Alleged Predicate Acts # 1, # 2; Single Act or Multiple Acts?

As a preliminary matter, the Court holds that what Doreen has labeled Predicate Acts # 1 and # 2 (the attempted bribery or "shakedown") is actually only one predicate act. Although the Second Circuit has made clear that multiple acts of racketeering are not to be excluded from the reach of RICO "simply because ... they further but a single scheme," plaintiffs cannot fragment a singular act into multiple acts in order to invoke RICO. *Indelicato*, 865 F.2d at 1383; *Schlaifer Nance*, 119 F.3d at 98 ("[C]ourts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO.").

This is not a situation like that in *Indelicato*[27] or *United States v. Kaplan*, 886 F.2d 536, 542–43 (2d Cir.1989),[28] where more than one act was conducted at the same time but still could be counted as two separate acts. Here, there is allegedly one act attempted by the same officials against the same victims on two occasions. Doreen implicitly admits that these acts are actually only one attempt to extort money by claiming that after no money was provided to Local 282 Officials in response to the first shakedown, these officials made a "[r]evised [d]emand for a bribe [raised to almost $500,000]." Pls.' Mem. in Opp'n at 29; *see also id.* at 3 ("Local 282, subsequently demanded a modified bribe with a value of almost $500,000."); Pls.' Damage Statement, Ex. 2A to Kramer Decl., at 3 (characterizing the second attempt as a "revised demand" and the whole scenario as one bribe by stating "Plaintiff's refusal to pay this bribe, set in motion ... "); *see also* M. Loguidice Dep., Ex. 3A to Kramer Decl. at 375 (stating that they only tried to shake him down "once"). Thus, this Court holds that Doreen's classification of this "shakedown" as two predicate acts "is an attempt ... to go beyond Congress's intent and fragment an act that plainly is unitary into multiple acts." *Indelicato*, 865 F.2d at 1383.

#### b. Relatedness

This alleged demand for a bribe cannot constitute a predicate act in furtherance of a RICO conspiracy because no reasonable trier of fact based on the facts as asserted by Doreen could find that this act meets the requirements of Section

**27.** In *Indelicato*, the court held that nearly simultaneous shooting and killing of three people to effect one goal constituted more than one predicate act of racketeering activity and sufficiently established a pattern. *Indelicato*, 865 F.2d at 1381–1385.

**28.** In *Kaplan*, the Defendant committed two distinct acts of bribery during one conversation and the court counted the two bribes as two predicate acts of racketeering activity. *Kaplan*, 886 F.2d at 542.

1962(c) that the act be "related" to the other alleged acts of racketeering. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *Sutera*, 73 F.3d at 15. As noted above, to succeed in a RICO action, the plaintiff must establish that a defendant committed two or more acts that constitute a pattern of racketeering activity. *Agency Holding Corp.*, 483 U.S. at 154, 107 S.Ct. 2759. To establish such a pattern, a plaintiff must demonstrate, *inter alia*, that the predicate acts are related. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Schlaifer Nance*, 119 F.3d at 97; *Indelicato*, 865 F.2d at 1381; *Econ. Opportunity*, 47 F.Supp.2d at 363. Here, the undisputed facts and allegations by Doreen demonstrate that the alleged acts # 1 and # 2—which the Court has determined constitute only one act—are not sufficiently related to the remainder of the alleged RICO scheme to comprise part of a pattern of racketeering activity.

The primary proof that these acts are not related to the alleged RICO scheme comes from Doreen's own admissions. Doreen admits that after the consent decree, the goal of the illegal enterprise "shifted" from bribery to "retaliation and intimidation." Pls.' Mem. in Opp'n at 50. These alleged acts of soliciting a bribe occurred before the original consent decree was in place (March 22, 1995). Accordingly, they were a part of the prior criminal enterprise for which Local 282 was prosecuted and because of which Local 282 entered into a consent decree. Doreen makes this dichotomy clear in its Damage Statement. It claims two enterprises existed. The first enterprise is the same enterprise as described in the government's complaint against Local 282 (that resulted in the consent decree) and involves the attempted bribery alleged in acts # 1 and # 2. Pls.' Damage Statement, Ex. 2A to Kramer Decl., at 3. The

"second and distinct criminal enterprise consist[ed] of Local 282 and the Local 282 Trust Funds ... (the 'Local/Funds Enterprise')," and began after these initial acts were conducted. Doreen explained that:

> [its] refusal to pay this bribe [part of the first enterprise], however, set in motion *separate* criminal misconduct engaged in through a *distinct criminal enterprise*, the purpose of which was to retaliate against and punish Plaintiffs, to make an example of them to other construction industry participants, and assure other construction enterprises would tow the line and accede to demands of Local 282.

Pls.' Damage Statement, Ex. 2A to Kramer Decl., at 3 (emphasis added). The subsequent criminal conduct allegedly engaged in by Local 282 and the Trust Funds was committed, according to Doreen, for a single purpose—to retaliate against Doreen for refusing to pay bribes which Local 282, through the pre-existing Gambino/Local 282 Enterprise, had unsuccessfully attempted to extort from Doreen. *Id.* at 4.

Although Doreen attempts to incorporate the attempted shakedown into the alleged existing enterprise, it is clear from Doreen's own submissions that they are not a part of the same scheme. They do not share a common goal or methodology with respect to the other predicate acts. *Indelicato*, 865 F.2d at 1382 ("An interrelationship between acts, suggesting the existence of a pattern, may be established in a number of ways. These include proof of their temporal proximity, or common goals, or similarity of methods, or repetitions."); *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 16 (2d Cir.1989) (stating that a pattern is shown if conduct "embraces [ ] acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distin-

guishing characteristics and are not isolated events" (quoting 18 U.S.C. § 3575(e))). The goal of the other predicate acts alleged was to "retaliate against [Doreen], by intimidating them and other construction industry participants. The scheme was to spread lies, backed up by the Trust Funds' paperwork, throughout the industry, that [Doreen] w[as] not properly paying fringe benefits contributions and would not cure such deficiencies." Pls.' Mem. in Opp'n at 50–51; Pls.' Damage Statement, Ex. 2A to Kramer Decl., at 5. The goal of the attempted shakedown, on the other hand, was not to punish Doreen or drive them out of business but purely to extort money—unrelated to any allegations of underpayment. *See* M. Loguidice testimony, Ex. 3A to Kramer Decl., at 61–63, 109–111 (testifying that Collusi gave him a piece of paper with numbers on it and stated that "if [Loguidice] want[s] labor peace, this is what we're looking for"); Am. Compl. ¶ 45(A) (claiming that the shakedown was for kickbacks to employees). Doreen itself explicitly admits that the shakedowns did not share the same purpose as the other alleged acts. Pls.' Mem. in Opp'n at 52 (noting that "*aside* from Defendant's shake-down efforts and pre-Consent Order racketeering, Defendant's post–1993 predicate misconduct was for the same purpose, i.e., to intimidate a number of different corporate entities, their owners and their employees and to retaliate against them by financially injuring them, destroying their ability to compete in New York" (emphasis added)).

Thus, when considering the attempted shakedown in light of Doreen's own characterization of the goal of the criminal enterprise, it fails to be sufficiently related. Therefore, the Court holds that the acts labeled # 1 and # 2 are not sufficiently related to the alleged enterprise to comprise part of a pattern of racketeering activity. Moreover, since the attempted shakedown has been found by this Court to be only one act, it cannot, on its own, support a separate RICO enterprise since at least two predicates are required.

### c. Extortion?

■ Even if the attempted bribery were sufficiently related to the alleged enterprise, it would fail to constitute a predicate act in furtherance of RICO because there is no evidence upon which a jury could find that this act constitutes extortion. *Scotto*, 143 F.3d at 114 ("To defeat a [summary judgment] motion, 'there must be evidence on which the jury could reasonably find for the non-movant.'" (quoting *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505)). As discussed earlier, to make out a claim for extortion under New York or Federal Law, the plaintiff must, *inter alia*, show that the defendant threatened force or violence or instilled fear in the plaintiff. 18 U.S.C. § 1951(b)(2); N.Y. Penal Law § 155.05(2)(e); *Bldg. Indus. Fund*, 992 F.Supp. at 176 n. 9. Doreen points to absolutely no evidence in the record that suggests the attempted shakedown allegedly committed by Local 282 was conducted by force or violence or threat of force or violence or that Local 282 officials instilled fear. While it is true that Doreen submitted evidence that Conti and Collusi suggested that all of Doreen's labor problems would cease if they paid the bribe, there is no evidence that Doreen actually feared labor unrest or economic loss if it did not agree. *See United States v. Capo*, 817 F.2d 947, 950 (2d Cir.1987) (stating that the fear may be fear of purely economic loss). To the contrary, testimony shows that these bribes were not taken seriously. Dorothy Loguidice considered them to be a "fishing" expedition and "a joke." Michael Loguidice showed similar nonchalance by chalking it all up to Collusi being "crazy," throwing the alleged written

demand out the window, and telling his wife to "forget about it." This testimony does not support—and Doreen points to no testimony that does support—that Doreen believed that the Defendants would use their power to Doreen's detriment. *See id.* at 951. While the Court must view all evidence in the light most favorable to Doreen at the summary judgment stage, Doreen's failure to go beyond the pleadings and provide affidavits or deposition testimony in support of its allegations is fatal. *Celotex,* 477 U.S. at 323–324, 106 S.Ct. 2548; *Scotto,* 143 F.3d at 114. Therefore, the Court holds in the alternative that this act is not extortion and thus not a predicate act.

### 3. Predicate Acts # 3, # 5–8

#### a. Relatedness

■■■ The Court begins by analyzing whether or not there is a genuine issue of material fact regarding relatedness of these remaining acts (# 3, and # 5–8). Even viewing the record in the light most favorable to Doreen, it is clear that predicate act # 3 (the alleged overpayment stemming from John Doe information included in the shop steward report) is not sufficiently related to predicate acts # 5–8 to support a RICO claim. The participants, method of commission, victims, and results are very different than those of predicates # 5–8. *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. 2893 (" '[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " (quoting 18 U.S.C. § 3575(e))). The major participant in predicate # 3 is Richard Kane. In predicates # 5–8, the major participants were men that were eventually removed from office for their previous RICO behav-

ior, e.g., Menechino Sr., Finch, and Conti. The method by which the act was conducted is also distinguishable. In predicates # 5–8 there was use of force or threat of force aimed at the drivers themselves. While the ultimate goal of predicates # 5–8 may have been the same as that of predicate # 3, to cause loss of profits and create fraudulent records, the immediate victims were the drivers. In predicate act # 3, on the other hand, there were no threats involved. Moreover, the drivers of Doreen's trucks were not the victims in this act. They were not negatively affected by this behavior. The only potential victim was Doreen in that Doreen may possibly have been charged for drivers who were not Doreen's employees.

For these reasons, the Court rules that predicate act # 3 is not sufficiently related to the other alleged predicates to be maintained.

Even if this were not the case, act # 3 could not be considered a predicate act because as alleged it is not extortion. There is no allegation that this act involved the threat of force, violence or fear, as required under both the N.Y. Penal Law § 155.05(2)(e) and the Hobbs Act, 18 U.S.C. § 1951.

#### b. Continuity

To establish a pattern of racketeering activity, the plaintiff must show "a relationship between the predicates *and* . . . the threat of continuing activity." *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. 2893 (emphasis added) (internal quotations and citation omitted); *Id.* at 237, 109 S.Ct. 2893 ("Congress was concerned in RICO with long-term criminal conduct."); *GICC Capital Corp. v. Tech. Finance Group, Inc.,* 67 F.3d 463, 466 (2d Cir.1995) (explaining that plaintiff must allege "either an 'open-ended' pattern (i.e., past criminal conduct coupled with a threat of future criminal

conduct) or a 'closed-ended' pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)").

■ The strongest arguments against finding closed-ended and open-ended continuity here are that the alleged predicate acts were limited in duration (seven months) and they posed no threat of long term continuing racketeering activity because the officials behind the activity were removed from office. These arguments fail, however, for various reasons. *See* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L.Rev. 982, 1133 (2003) ("[A]n unfettered commitment to 'efficiency' in the pretrial disposition context—whatever its motivation or however articulated—will erode other systemic values.").

■ It is true that the potential threat of continued activity was stymied. A consent decree, specifically tailored against the type of activity alleged in predicates # 5–8, was put in place and a corruption officer was appointed by the United States Attorney's office to investigate, gather evidence, and take actions to eliminate the influence of corruption from Local 282. Pls.' Damage Statement, Ex. 2A to Kramer Decl., at 2–3. As a result of these efforts, most of the major actors in these alleged predicates (Finch, Menechino Sr., and Collusi) were removed from their positions of authority because of their corruption. Pls.' Mem. in Opp'n at 50. Indeed, there are no allegations remaining of similar types of retaliatory, intimidating behavior since the month these actors were removed. Nevertheless, this does not negate the threat of continuing racketeering activity here because "the analysis of the threat of continuity cannot be made solely

from hindsight." *United States v. Aulicino*, 44 F.3d 1102, 1112 (2d Cir.1995) (quoting *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.1991)). Instead, the Court must consider the totality of the circumstances surrounding the commission of the predicates to determine whether there is a threat of continuing criminal activity. *United States v. Kaplan*, 886 F.2d 536, 542–43 (2d Cir.1989). Here, the activities involved did not have an "inherently terminable" goal like the sale of land. *Cf. GICC Capital*, 67 F.3d at 466 (finding no open-ended continuity when scheme was "inherently terminable" and noting that "it defies logic to suggest that a threat of continued looting activity exits when ... there is nothing left to loot"). For that matter, there is no basis for viewing Local 282's activities as a "discrete and finite project that came to a natural end"—a distinction that the Second Circuit highlighted in *Aulicino* as determinative. *Aulicino*, 44 F.3d at 1114 (finding 3½ month conspiracy satisfied continuity requirement). Instead, like in *Aulicino*, the alleged RICO activity was stopped by the removal of the primary people responsible for the behavior. *Aulicino*, 44 F.3d at 1114 (finding that the activity appeared to have ended because of lack of leadership and fear of being caught). When considering this in the overall context—that Defendants actually engaged in RICO activity in the past and had entered into a consent decree because of it—the Court cannot rule as matter of law that continuity does not exist.

The defendants alternatively argue that there is no continuity because the goal here had a foreseeable end-point in that Doreen alleges in its complaint that the goal was to force Doreen out of business in the industry. *See, e.g.,* Trustees' Mem. in Supp. at 45 (citing Am. Compl. ¶¶ 52, 53, 55 and relying on *F.D. Property Holding*

*v. U.S. Traffic Corp.,* 206 F.Supp.2d 362, 370 (E.D.N.Y.2002)). This argument, although persuasive, fails because Doreen also alleged that the goal was to "retaliate against [Doreen] by intimidating [it] and other industry participants." Pls.' Mem. in Opp'n at 50. Indeed, the complaint taken as a whole alleges that the Defendants' goal was not simply to put Doreen out of business but to set up a regime to force Doreen—and other companies—to pay bribes or suffer injury. *See, e.g.,* Am. Compl. §§ 52 and 48. While it is true that Doreen has not pointed to any evidence supporting its allegations that Defendants committed RICO activity against other industry participants, it has submitted evidence upon which a reasonable jury could believe its theory of retaliation and could determine that this retaliatory conduct did not have a natural or foreseeable endpoint. Doreen does not allege that the Defendants had—nor does the evidence show—a detailed plan to put Doreen out of business in the foreseeable future like there was in *Pier Connection, Inc. v. Lakhani,* 907 F.Supp. 72 (S.D.N.Y.1995). Instead, the process of putting Doreen out of business was an end in itself—one that could work to send a message to the industry that a company has to play ball with Local 282. The "fortuitous interruption of that activity" cannot be used to show a lack of threat of continuity. *Nafta v. Feniks Int'l House of Trade,* 932 F.Supp. 422, 427 (E.D.N.Y.1996) (quoting *Busacca,* 936 F.2d at 238). Therefore, a jury could find on this record that "there was nothing to stop [these Local 282 officials] from continuing" to threaten and intimidate Doreen had they not been removed for corruption. *Busacca,* 936 F.2d at 238.

■ Moreover, the Supreme Court stated that open-ended continuity is satisfied "where it is shown that the predicates are a regular way of conducting defen-dant's ongoing legitimate business." *H.J. Inc.,* 492 U.S. at 243, 109 S.Ct. 2893. Here, a reasonable jury could find that threats and intimidation to extort from Doreen were a regular way of conducting business, since it is undisputed that the Defendants committed RICO misconduct and had entered into a consent decree to prevent just this sort of behavior. Therefore, viewed in the light most favorable to Doreen, the Court holds that a reasonable trier of fact could find that the facts indicate that the activity was capable of repetition and "likely to continue for the indefinite future, absent outside intervention." *Aulicino,* 44 F.3d at 1112; *Nafta,* 932 F.Supp. at 427 ("Although a single scheme that is inherently terminable or acts that focus on a clearly defined, discrete and finite goal, generally cannot establish the threat of ongoing continuity, such a threat does exist where the facts indicate that the defendant was prepared to undertake an extended series of criminal acts that would continue indefinitely." (internal quotations and citations omitted)); *H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. 2893.

## IV. CONCLUSION

Accordingly, the Trustees' motion for Summary Judgment [Doc. No. 318] is ALLOWED and Local 282's motion for Summary Judgment [Doc. No. 324] is ALLOWED in part (as to predicates # 1–3 and # 9–16) and DENIED in part (as to predicates # 5–8).

SO ORDERED.